Isaac **MANEGO**, Plaintiff,

v.

The **ORLEANS BOARD OF TRADE**, et al., **Defendants.**

**Civ. A. No. 83–0045–C.**

United States District Court, D. Massachusetts.

Nov. 27, 1984.

Charles Ray Weidman, Chatman, Mass., for plaintiff.

Samuel Hoar, Laura L. Carroll, Goodwin, Procter & Hoar, Boston, Mass., for Cape Cod 5 Cent Savings Bank and David B. Willard.

Albert P. Zabin, Schneider, Reilly, Zabin, Connolly & Costello, Boston, Mass., for Orleans Bd. of Trade & 90 other Persons as Members.

## MEMORANDUM

CAFFREY, Chief Judge.

This is a civil action brought pursuant to antitrust statutes, 15 U.S.C. §§ 1–15, which includes a pendant state law claim for unfair business practices. M.G.L. c. 93A. The plaintiff, Isaac Manego, alleges that the defendants conspired to orchestrate the denial of license applications, thereby producing an adverse anticompetitive effect. The defendants are David Willard, The Cape Cod Five Cents Savings Bank ("Bank"), the Orleans Board of Trade ("Board of Trade"), and its members. At times relevant to the events complained of, defendant Willard was both the President of the Board of Trade and an officer of the Bank. The case is now before the court on defendants' motions for summary judgment. Fed.R.Civ.P. 56(b).

This case is the third round of litigation initiated by plaintiff relating to the denial of his application for entertainment and liquor licenses in the Town of Orleans, Massachusetts. In the first case, *Manego v. Board of Selectmen of the Town of Orleans*, C.A. No. 38824 (*"Manego I"*), the plaintiff sought a writ of mandamus from the Massachusetts Superior Court. Upon dismissal of that action, plaintiff instituted his second case, a civil rights action in this Court, *Manego v. Cape Cod Five Cents Savings Bank, et al*, C.A. No. 80–1406–MC (D.Mass. April 13, 1982) (*"Manego II"*) which terminated in summary judgment for the defendants. The Court of Appeals affirmed. *Manego v. Cape Cod Five Cents Savings Bank*, 692 F.2d 174 (1st Cir.1982).

In substance, the plaintiff's present complaint is based on and addresses the same events that were the subject of both the earlier cases. In early 1979, the Orleans Board of Selectmen denied the plaintiff's applications for the liquor and entertainment licenses necessary to operate a proposed disco. The plaintiff alleges that his application was denied as a result of a conspiracy among the defendants, including the Board of Trade, the Bank, and David Willard. The alleged purpose of the conspiracy was to allow the Bank, through

a sham transaction, to offer similar entertainment at the nearby Lower Cape Sports Arena ("Arena") free of competition from Mr. Manego. Indeed, it is undisputed that an entertainment license was issued to the Arena after the denial of plaintiff's application.

Defendants Cape Cod Five Cents Savings Bank and David Willard were also defendants in Manego II. The Orleans Board of Trade was not named as a defendant in the earlier actions, and a reference to Willard's status as president of the Board was stricken from the complaint on defendant Bank's motion.

## DEFENDANTS CAPE COD FIVE CENTS SAVINGS BANK AND DAVID WILLARD

Defendants Willard and the Bank move for summary judgment on grounds that the plaintiff's action is barred under the doctrine of *res judicata* and on the grounds that the alleged conspiratorial acts are protected by the First Amendment.

■■■ Under the doctrine of *res judicata*[1] "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). *Res judicata* is a bar only where the subsequent case concerns the same cause of action or claim. *E.g. Cromwell v. County of Sac,* 94 U.S. 351, 4 Otto 351, 24 L.Ed. 195 (1876). With the adoption of the Federal Rules of Civil Procedure the concept of "cause of action" has broadened beyond that of a single legal issue narrowly drawn in a writ. *See* 18 J. Wright, Miller & Cooper, Federal Practice and Procedure § 4407 n. 20. The scope of preclusion has necessarily expanded with

the definition of "claim" or "cause of action." *Id.*

The exact contours of claim preclusion are a subject of much discussion and disagreement. *See Id.,* 18 J. Moore, Moore's Federal Practice ¶ 0.410[1]. The Restatement (Second) of Judgments (1982) adopts a "transactional" definition of the scope of issue preclusion:

The present trend is to see claim in factual terms and to make it coterminous with the transaction regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff; regardless of the number of primary rights that may have been invaded; and regardless of the variations in the evidence needed to support the theories or rights. The transaction is the basis the litigative unit and may not be split.

Restatement (Second) § 24 Comment a.

A number of other approaches to the preclusive scope of an earlier action have evolved in the case law. These include:

—Whether the actions are based on identical grounds.

—Whether the factual basis of both claims is the same.

—Whether the essential facts and issues have been similarly presented in both cases.

—Whether the same right is infringed by the same wrong.

—Whether the wrong for which redress is sought is the same in both actions.

—Whether the two actions are so similar that a different judgment in the second would destroy or impair rights or interests established in the first.

21 Federal Procedure Lawyers Edition § 51:201.

The Court of Appeals for the First Circuit has articulated a position closer to the broad restatement view.[2] *Isaac v.*

---

**1.** In this area of law both courts and commentators have been inconsistent in their use of terminology. For purposes of clarity, I use the term "claim preclusion" to describe the preclusive effect of a judgment on the merits between parties or their privies in the same cause of action. "Issue preclusion" or "collateral estop-

pel" describes the preclusive effect of a prior judgment on an issue of law or fact in a different cause of action involving a party. *"Res judicata"* is a general term which applies to both types of preclusion.

**2.** Because the prior actions in *Schwartz, Roy* and *Lovely* took place in state courts, state *Res*

*Schwartz,* 706 F.2d 15 (1st Cir.1983), *Lovely v. Liberte,* 498 F.2d 1261 (1st Cir.1974). In *Lovely,* the Court of Appeals held that a state court action for possession barred a subsequent § 1983 action because the parties were the same and concerned the same "operative nucleus of fact." *Id.* at 1263. In *Issac* the Court went further in its analysis:

> Given the initial dismissal, the issue before us is simply whether the new complaint grows out of the same transaction or series of connected transactions (Restatement (Second) of Judgments § 24) as the old complaint. If so, the fact that appellant now asserts new legal theories ... does not help him.

*Supra* at 17. Recently the Court of Appeals reaffirmed this approach in *Casagrande v. Agoritsas,* 748 F.2d 47 (1st Cir. 1984).

I note that plaintiff Manego alleges facts in this antitrust action which are strikingly similar to those in *Manego II.* The present complaint differs only in that it names additional defendants (the Board of Trade), and alleges that the Bank planned to offer entertainment at its facility similar to that which plaintiff Manego would have provided at his disco.

The plaintiff argues that because he did not learn of the Bank's plans until three days before summary judgment was granted, his action, based upon this new knowledge, is not barred. The plaintiff further argues that because a reference to Mr. Willard's status as president of the Board of Trade was stricken from the *Manego II* pleading on defendant Bank's motion, the antitrust issues could not have been raised in the earlier proceeding.

 Despite the plaintiff's contentions it is apparent that the present case concerns the same transaction or nucleus of

fact that was adjudicated in *Manego II.* The mere fact that plaintiff failed to discover the Bank's plans until shortly before a final judgment does not affect its preclusive effect.[3] A judgment bars all claims prior to its entry. *Lawlor v. National Screen Service,* 349 U.S. 322, 328, 75 S.Ct. 865, 868, 99 L.Ed. 1122 (1955). Given the discovery and amendment provisions of the Federal Rules of Civil Procedure, plaintiff certainly could have obtained the necessary evidence to litigate his alternate theory in the first proceeding. Finally, the addition of new defendants in a subsequent action does not affect the preclusive effect of the judgment as to the original parties. *E.g. Scarpa v. Fair,* C.A. No. 82–2333, slip op. at 7 (D.Mass. April 11, 1983).

Accordingly, I rule that plaintiff's action against defendants Cape Cod Five Cents Savings Bank and David Willard is barred, and also rule that those defendants are therefore entitled to summary judgment.

### DEFENDANT ORLEANS BOARD OF TRADE

The Board of Trade moves for summary judgment on the following grounds: that the doctrine of *res judicata* bars the present action, that there is no genuine issue of material fact relating to the allegations of conspiracy, and that the alleged conduct had no adverse effect on interstate commerce.

 Because the Board of Trade was not a party to *Manego II,* claim preclusion principles do not bar the present action. Furthermore, those members of the Board of Trade who were parties to the prior action may not rely on claim preclusion insofar as they are presently named as defendants in a different capacity. 1B J. Moore, Moore's Federal Practice ¶ 01411[3].

---

*Judicata* principles were applied. In *Schwartz* the Circuit court described the Massachusetts approach as "perfectly traditional," *Id.* 706 F.2d at 17, citing *Angel v. Bullington,* 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947).

**3.** The complaints in *Manego I* and *Manego II* both allege that an entertainment license was

issued to the Bank after the denial of Mr. Manego's application. Plaintiff claims only that he did not know what the Bank's plans were for the licensed premises. Moreover, the events which plaintiff complained of took place primarily in the summer of 1979, years before judgment was entered.

Issue preclusion, on the other hand, may bar relitigation of issues actually litigated and necessary to a prior judgment in a different cause of action, and may be asserted defensively by a stranger to the original action. *Parklane Hosiery v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Accordingly, the Board of Trade argues that the plaintiff should be estopped from relitigating the issue of conspiracy, claiming that it was resolved in favor of the defendants in *Manego II.*

■ Even an express finding that there was no conspiracy among the defendants in *Manego II* would not bar the present case. Because the Board of Trade was not a party to the earlier action the existence of a conspiracy involving the Board was not before the Court. I rule, therefore, that the prior judgment has no preclusive effect on this aspect of the present case.

■ The defendant's claim that there is no genuine issue of material fact is inexorably tied to what is commonly known as the *Noerr-Pennington* doctrine. *See Eastern Railroad Presidents Conference v. Noerr Motor Freight Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Generally stated, this doctrine exempts, with certain exceptions, concerted attempts to influence the passage or enforcement of laws from the sweep of antitrust legislation regardless of anticompetitive intent.

On the face of plaintiff's complaint, it is apparent that the allegations which relate to the Board of Trade involve attempts to influence governmental entities. Therefore, *Noerr-Pennington* applies unless the activity falls within one of the exceptions to the doctrine.

The complaint sets forth the following allegations. David Willard, an employee of the Bank and President of the Board of Trade, enlisted the "conspiratorial aid and assistance" of the members of the Board to "conduct sham opposition" to Manego's ap-

plications. He was assisted in so doing by a majority of the Board of Selectmen acting as members of the Board of Trade, who also exerted pressure on members of the Board to block the plaintiff's plan to operate a disco in Orleans. The purpose of this plan was to assure that the plaintiff's proposed disco would not be in a position to compete with the Bank, which planned to offer similar entertainment at the arena near plaintiff's site. In January 1979, the Board of Trade, at a meeting chaired by Willard and attended by two of the three Orleans selectmen, unanimously voted to oppose the plaintiff's license applications. Subsequently, Willard reported this vote to the full Board of Selectmen during the January 11 hearing on plaintiff's license applications. Approximately 100 persons attended the meeting, many as a result of the defendants plan to oppose the applications.

The Board of Selectmen denied plaintiff's application for a liquor license on February 8, 1979, and on February 14, 1979 held a hearing on the amusement license application. After conducting a traffic study which was intended only as a spurious excuse for denying the application, the selectmen denied the amusement license application, unlawfully, on the basis "of noise and traffic considerations." The subsequent development of some twenty-five businesses in the area, plus the issuance of an entertainment license to the Bank's arena, attest to the spurious nature of the selectmen's reasons for denial. Furthermore, intersections in the area have been improved and upgraded to handle this increased traffic.

In support of motions for summary judgment, defendants have resubmitted the affidavits of Herbert Wilcox, chairman of the Board of Selectmen, David Willard, and Charles Darling, a salesman at Nickerson Lumber Company, as well as excerpts from depositions of Willard, the plaintiff, and Paul Thiebert. Although several of the affidavits were prepared for the earlier litigation in *Manego I* and *Manego II,* they are nevertheless pertinent to the issues in this case.

Herbert Wilcox states in his affidavit that he voted against the issuance of license because of the "likelihood of increased traffic hazards and noise pollution" and "gave some weight to the overwhelming sentiment of the citizens who [opposed the disco] and to the traffic committees report." As to the issuance of a similar license to the arena, Wilcox stated that the rink held a similar license previously which had not been renewed because of an oversight. He voted for issuance because of the rinks proven "benefits to the community" and because it had never caused inconvenience or concern.

Mr. Willard's affidavit states unequivocally that "I have never had, and, to my knowledge, no other Bank employee has had private conversations with any of the Selectmen concerning the proposed disco while Mr. Manego's applications ... were under consideration," and "Nor did I ... or the Bank conspire with Orleans officials to deny Mr. Manego the requested licenses [for] improper reasons."

Mr. Willard testified at deposition that two of the Selectmen were members of the Board of Trade, but did not recall if they were present at the meeting when the disco was discussed. He further testified that he did not urge members to attend the license hearing, and that he was, at the time, an officer of the Bank. A discussion was held as to the desirability of the disco, and all but two of the 70–75 persons present opposed the project.. The next day, Willard attended the license hearing, and, as president of the Board of Trade, informed the selectmen of the vote.

Paul Thibert, who managed the rink for the Bank, testified at deposition that there was never any "discussion of any threat of competition [from Mr. Manego]" among the Bank or Board of Trade.

The substance of the materials offered by the defendants is that the selectmen denied the plaintiff's license applications for permissible reasons, that there were no private conversations between Willard and the Selectmen, and that there was no discussion between the Bank and Board of Trade regarding Mr. Manego's disco as a potential competitor. These are denials of conspiracy from a selectman, the President of the Board of Trade, and an Officer and an employee of the Bank.

In support of his allegations, the plaintiff has produced several affidavits, extracts from depositions, and other evidence. The supplementary affidavit of Roger Hurlich, a builder reaffirms his earlier affidavit to the effect that the Bank had pressured Nickerson Lumber Company not to sell building supplies to Manego for the proposed disco. Even if taken as true, this evidence is not probative as to any conspiracy involving the Board of Trade. In response to an interrogatory requesting facts to support the allegations of conspiracy, the plaintiff answered "The meetings of the Board of Trade with David Willard as President held in January, February and subsequently in 1979, as set forth in the minutes of said meetings, and as testified to in deposition by David Willard." These materials reveal only that meetings were held, that two selectmen may have attended, and that the disco project was discussed and voted upon. When asked at deposition for the basis of his allegations of a conspiracy involving the selectmen, the plaintiff responded that "any time the selectmen attend a meeting and they were a member of the board of trade, that was illegal. That's conspiracy." The plaintiff did testify that an unidentified person had told him that officials of the Bank, Board of Trade and Board of Selectmen had met to oppose the disco, but he does not know the mans name. When asked what the Board of Trade did that was wrong, he said, "it was wrong for them to come out against me in opening a business."

■■■■■ The materials under consideration must be evaluated in light of the particular requirements of the substantive law in this area, i.e. whether there is a genuine issue of material facts which would allow the plaintiff to recover under an exception to the *Noerr-Pennington* doctrine. The plaintiff contends that two exceptions apply: the so-called "sham" and "conspiracy"

exceptions. The former, developed in a line of cases beginning with *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), applies where a party seeks not to influence public officials, but to "bar their competitors from meaningful access to adjudicatory tribunals and so to usurp the decisionmaking process." *Id.* at 512, 92 S.Ct. at 612. *Trucking Unlimited* concerned a series of "baseless repetitive claims" designed "to discourage and ultimately to prevent the [plaintiffs] from invoking the processes of the administrative agencies and courts," *Id.* at 512, 92 S.Ct. at 612. Subsequent developments have held that this exception also applies to a single suit filed for an improper purpose, such as generating publicity unfavorable to a competitor. *E.g. Energy Conservation v. Heliodyne,* 698 F.2d 386 (9th Cir.1982). Activity disguised as petitioning which is simply an effort to interfere directly with a competitor is not protected under *Noerr-Pennington. Clipper Express v. Rocky Mountain Motor Tariff Bureau,* 690 F.2d 1240 (9th Cir.1982), *cert. denied,* 459 U.S. 1227, 103 S.Ct. 1234, 95 L.Ed.2d 468. Other types of activity which fall within the "sham" exception are misrepresentation, *Israel v. Baxter Laboratories, Inc.,* 466 F.2d 272, 275–79 (D.C.Cir.1972); and threats or coercive measures to influence state officials, *Sacramento Coca-Cola Bottling Co. v. Teamsters Local 150,* 440 F.2d 1096 (9th Cir.), cert. denied, 404 U.S. 826, 92 S.Ct. 57, 30 L.Ed.2d 54 (1971). In order for the "sham" exception to apply:

> What is needed … is proof that the lobbyists subverted the integrity of the governmental process, that they effectively barred [the plaintiffs] access to these processes, or that the nature of these processes made their invocation something other than the "political activity" that was recognized by the *Noerr-Pennington-Trucking Unlimited* line of cases to be beyond the scope of the Sherman Act.

*Federal Prescription Service v. American Pharmaceutical Ass'n,* 663 F.2d 253, 262–

63, (D.C.Cir.1981), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982).

■ The plaintiff points to a suit filed by the Bank in opposition to the Selectmen's grant of a Building permit to Mr. Monego as such a "sham" abuse of process. He offers no evidence, or even the promise of evidence, that this suit was anything other than protected activity. Even with all inferences drawn most favorably to the plaintiff, there is no indication of misconduct which would rise to the level necessary to invoke the "sham" exception to *Noerr-Pennington.* At the core of this deficiency is the plaintiff's failure to produce any evidence that the lawsuit was instituted for an unlawful purpose. The fact that the suit was subsequently, withdrawn after the Bank's purported sale of the arena does not support an inference that the object of the suit was unlawful. Moreover, the "sham" was allegedly perpetrated by the Bank, and not the Board of Trade. Therefore, absent evidence that the Board of Trade conspired with the Bank as to this allegedly "sham" suit, it is irrelevant to the issue of the Board's immunity under Noerr-Pennington. The plaintiff has not offered such evidence, nor has he even alleged that a conspiracy existed with regard to the suit.

The plaintiff further contends that this case falls into the "sham" exception because he was deprived of "meaningful access" to governmental entities because his experience with those entities has "been replete with animosity and conflicts of interest." In his argument, plaintiff relies heavily upon *Clipper Exxpress v. Rocky Mountain Motor Tariff,* 690 F.2d 1240 (9th Cir.1980), where summary judgment for defendants was reversed on appeal. That case is distinguishable from the present action in that the *Clipper* defendants admitted, for the purpose of summary judgment, that they had engaged in a conspiracy to file baseless protests for the sole purpose of eliminating competition. *Id.* at 1250–51. The Board of Trade has made no such admissions. Rather, its president has testified that the Board of Trade merely sponsored a discussion of the project and

reported this discussion to the licensing authority at a public hearing. All that the plaintiff is able to show as to his experience with the Board of Selectmen is that he was unsuccessful in his repeated attempts to obtain the necessary licenses.

It is clearly established that conduct genuinely intended to influence governmental action is immune from the sweep of antitrust law and that whether the effort is genuine or a sham is an issue of fact. *Id.* at 1253. Here, the plaintiff has produced no evidence in opposition to the defendants' affidavits and deposition testimony to show, or to raise an inference, that the Board of Trade engaged in anything other than protected petitioning before the Board of Selectmen. A party opposing a motion for summary judgment may not rest on mere allegations, but must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). I rule that the plaintiff has failed to do so.

Alternatively, the plaintiff invokes the "conspiracy" exception to *Noerr-Pennington* which applies where government officials participate with private individuals in a scheme to restrain trade. *E.G. Duke & Co. v. Foerster*, 521 F.2d 1277 (3rd Cir. 1975). In support of this contention, the plaintiff relies upon the fact that two of the three members of the Board of Selectmen were also members of the Board of Trade, and that they were present at the Board of Trade meeting when Mr. Manego's proposal was discussed, and that other businesses were subsequently licensed in the same area.

Generally, summary judgment is inappropriate in cases involving conspiracy claims because the existence or nonexistence of a conspiracy is essentially a factual issue to be decided by the jury. *Adickes v. S.H. Kress*, 398 U.S. 144, 176, 90 S.Ct. 1598, 1618, 26 L.Ed.2d 142 (1970). Summary judgment may also be inappropriate in antitrust cases where "motive and intent play leading roles." *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 472, 82 S.Ct. 486, 490, 7 L.Ed.2d 458 (1962). There are, however, exceptions to the general rule. Where a moving party in an antitrust conspiracy case has shown that the facts relied upon in the opposing party's allegations are not susceptible to the interpretation which he sought to give them, Rule 56(e) puts the burden on the opposing party to produce evidence in support of his allegations. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1957). Furthermore, a plaintiff may not rely upon the promise of evidence of conspiracy to be developed by cross-examination at trial. *Manego v. Cape Cod Five Cents Savings Bank, et al,* 692 F.2d 174 (1st Cir.1982), *Hahn v. Sargent,* 523 F.2d 461 (1st Cir.1975), *cert. denied,* 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 954 (1976).

Without express evidence of a conspiracy involving the Orleans Selectmen, the plaintiff must rely on inferences which may be drawn from their presence at the Board of Trade meeting and their subsequent actions. In an analogous situation, the Court of Appeals for the District of Columbia found that membership in an association was not evidence that regulatory officials were parties to an anticompetitive conspiracy. *Federal Prescription Service v. American Pharmaceutical Ass'n,* 663 F.2d 253 (D.C.Cir.1981), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982). The regulatory officials in *Federal Prescription* were members of state pharmacy boards, and also members of a national pharmacists association which was engaged in a program of lobbying before the state boards to oppose licensing of mail-order pharmacies. The court of appeals reversed the district court finding of conspiracy as "clearly erroneous" and ruled that the defendants were entitled to judgment as a matter of law under the *Noerr-Pennington* doctrine. *Id.*

Therefore, I find that the Selectmen's membership in the Board of Trade is not probative of conspiracy. In addition, the subsequent grant of an entertainment license to the arena has been explained as a legitimate exercise of licensing authority. The plaintiff has failed to introduce any evidence to contradict this assertion.

Finally, I note that the type of conspiracy which the plaintiff must show to escape the *Noerr-Pennington* Doctrine differs from that normally associated with antitrust litigation. Where the alleged conspirators are potential competitors or other market participants, conspiracy may be inferred from their market behavior, a situation which renders the determination particularly unsuitable for summary judgment. In this case the plaintiff alleges a conspiracy including governmental officials. Consequently, there is no market behavior to draw inferences from. Those facts which the plaintiff has submitted are either not probative as a matter of law or are explained by the unrebutted denials of parties to the alleged conspiracy.

I rule accordingly that even with all inferences drawn most favorably to the plaintiff, there is no genuine issue of material fact which, if proven by the plaintiff, would constitute an exception to the *Noerr-Pennington* Doctrine. Therefore, I rule that the defendants are entitled to judgment as a matter of law on the antitrust count. Because this disposes of the federal question portion of the case, the state law claims are dismissed.

Order accordingly.