**Isaac MANEGO, Plaintiff, Appellant,**

v.

**The ORLEANS BOARD OF TRADE, et al., Defendants, Appellees.**

**Isaac MANEGO, Plaintiff, Appellee,**

v.

**The ORLEANS BOARD OF TRADE, et al., Defendants, Appellees.**

**Cape Cod Five Cents Savings Bank and David B. Willard, Defendants, Appellants.**

Nos. 85–1032, 85–1033.

United States Court of Appeals, First Circuit.

Argued June 5, 1985.

Decided Sept. 3, 1985.

Charles Ray Weidman, Chatham, Mass., for Isaac Manego.

Laura L. Carroll, Boston, Mass., with whom Kenneth A. Cohen, Edward J. DeAngelo and Goodwin, Procter & Hoar, Boston, Mass., were on brief for Cape Code Five Cents Savings Bank and David B. Willard.

Albert P. Zabin, Boston, Mass., with whom Schneider, Reilly, Zabin, Connolly & Costello, P.C., Boston, Mass., was on brief for The Orleans Bd. of Trade.

Before COFFIN, RUBIN [*] and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

In this, the third lawsuit arising out of the refusal of the Orleans Board of Selectmen to issue entertainment and liquor licenses for the operation of a disco, plaintiff Isaac Manego appeals the district court's grant of summary judgment for the defendants, 598 F.Supp. 231 (D.Mass.1984). This complaint alleges an illegal conspiracy to restrain trade under the Sherman Antitrust Act, 15 U.S.C. § 1 et seq. (1982). Summary judgment for defendants David B. Willard and the Cape Cod Five Cents Savings Bank was granted under the doctrine of *res judicata.* Summary judgment for defendant Orleans Board of Trade and its members was granted on the ground that there was "no genuine issue of fact which, if proven by the plaintiff, would constitute an exception to the *Noerr-Pennington* Doctrine." We affirm.

In late 1978 and early 1979, Manego applied to the Orleans Board of Selectmen for entertainment and liquor licenses for a disco which he wanted to build on a vacant lot. The lot was located in a commercial district a few hundred feet from an ice skating rink. The rink at that time was primarily used by children for hockey and figure skating. During the winter there was also a "Disco on Ice" program for children under sixteen. As a result of a mortgage foreclosure, the Cape Cod Five Cents Savings Bank owned the rink from 1978 until July 1979. The vice-president of the bank, David Willard, served as general manager of the rink during this period. As owner of the rink, the bank was concerned about the close proximity of an establishment serving liquor to a recreational facility primarily patronized by children and the increased likelihood of automobile accidents involving inebriated drivers and children walking to and from the rink. The bank also had more general concerns about the presence of a disco in the area.

In January of 1979, there was a meeting of the Orleans Board of Trade, a private organization which functions as the chamber of commerce for the town. At that time, Willard was also the president of the Board of Trade. Membership in this organization is open to anyone who pays the $15.00 membership fee. Willard raised the issue of the proposed disco at the meeting and after some discussion the membership voted to oppose the disco.

On January 11, 1979, a public hearing on Manego's liquor license application was held by the Orleans Board of Selectmen. Two of the selectmen, Gaston Norgeot and Thomas Nickerson, were also members of the Board of Trade. Over 100 people attended the meeting and expressed concern over the increased traffic and noise which would result from the disco as well as the effect of an establishment serving liquor in close proximity to the skating rink and the general effect of a disco on the atmosphere of the Town of Orleans. The Board of Selectmen received a petition containing 369 signatures opposing the disco and eleven letters, only two of which favored Manego's proposal. At the hearing, Willard announced that the Board of Trade had voted to oppose granting a license for the disco.

On February 8, 1979, the Selectmen denied Manego's application for a liquor license and Manego appealed this decision to the Board of Appeals, which met on Febru-

[*] Of the Fifth Circuit, sitting by designation.

ary 8 and 14. Willard wrote a letter to the Board of Appeals setting forth the bank's opposition to the disco and its concern for the safety of the youngsters using the skating rink. Local counsel for the bank attended the Board of Appeals hearings. In late February, the Board of Appeals denied Manego's appeal.

On February 13, 1979, the Orleans Board of Trade held its monthly meeting and, according to the minutes, mention was made of a hearing scheduled for the next day on Manego's amusement license application and of Manego's appeal of the denial of the liquor license application by the Selectmen. At the February 14 amusement license hearing, the Selectmen requested that the Town Traffic Safety Committee study the effects of the proposed disco. On February 22, 1979, the Selectmen turned down Manego's application for an amusement license.

In spite of these license denials, the Orleans Board of Appeals granted Manego a building permit in May of 1979. The bank then filed suit in Barnstable Superior Court challenging the issuance of this permit. In July of 1979, the bank sold the rink to Paul Thibert and sometime in August withdrew its superior court suit.

In March of 1979, the entertainment license of the rink expired; no renewal was sought until July of 1979, after Thibert purchased the rink. Because the license had lapsed, the application was treated as a new application and not a renewal and a public hearing was held. During that summer, a concrete floor had been poured at the rink to allow roller skating so the new application added roller skating to the proposed activities of the facility. In addition, the rink planned to offer a ballroom dancing program for adults featuring live music from the 1940's and refreshments in the nature of soft drinks. This, too, was an addition to the rink's activities. The rink's application was granted by the Selectmen. Among the reasons cited by the Selectmen for their approval were its unique status as the only skating facility on the Lower Cape, its use by young people as safe and "noncorrupting" entertainment and the lack of noise or traffic problems created by the facility.

In his first lawsuit arising out of these events, Manego sought a writ of mandamus in superior court to compel the Board of Selectmen to issue him liquor and amusement licenses, claiming that the denial was arbitrary and capricious (*Manego I*). His affidavit stated that the real reason for the denial of the license was based upon his race (Manego is black) and that this was demonstrated by the fact that six months later a license to operate a similar business was granted to a white person. This suit was dismissed upon the motion of the Selectmen.

Manego brought a second lawsuit in federal district court (*Manego II*), naming the Board of Selectmen, the Cape Cod Five Cents Savings Bank and Willard as defendants and claiming that they had conspired to deny him the licenses because of his race in violation of 42 U.S.C. §§ 1981, 1983, 1985, 1986, 1988, 2000e et seq., § 3605 of the Fair Housing Act, and Mass.Gen.Laws Ann. ch. 151B, § 4(3B). The claims under 42 U.S.C. §§ 2000e et seq., the Fair Housing Act, and the state law claims were all dismissed by the district court for failure to state a cause of action. As to the other claims, the Board of Selectmen moved for summary judgment on the grounds that these claims were barred by the doctrines of *res judicata* and collateral estoppel. The district court rejected this argument because "claims made here were neither fully argued or adjudicated in the state proceeding." As part of our appellate review of the district court's opinion in *Manego II*, we noted in passing that the "proper test for the applicability of *res judicata* is not whether the plaintiff in fact argued his constitutional claims in the state proceedings, but whether he could have." *Manego v. Cape Cod Five Cents Savings Bank*, 692 F.2d 174, 175 (1st Cir.1982). We did not decide this issue, however, because we based our affirmation of the district court's grant of summary judgment upon the district court's determination that Manego

had not provided even a "promise of evidence" that defendants were involved in a conspiracy to deny him the licenses because of his race.

The district court in *Manego II* found that despite being given an extra ninety days to produce some concrete, factual basis for his allegation of conspiracy, which defendants had affirmatively denied in their affidavits, Manego produced only the following: two personal affidavits explaining his theory and suggesting that direct evidence of the conspiracy would emerge under cross-examination and a third affidavit of a local building contractor employed by Manego reporting that he had heard that a lumber company had been told by the Bank not to supply Manego with materials and vaguely suggesting that his own relationship with the bank had been adversely affected by his association with Manego. The district court found that since Manego had not taken advantage of an "ample opportunity" to take depositions or conduct any other form of discovery, his promise of evidence arising out of cross-examination was pure speculation, and that, furthermore, the affidavit of the building contractor could not be given any weight because it consisted primarily of hearsay.

In our opinion affirming the district court's grant of summary judgment on this ground, we said:

> In this case, plaintiff sought to infer the existence of an illegal conspiracy from the fact that the Selectmen granted a license to someone who was white but not to plaintiff, who was black. His inference is supported only by affidavit evidence of a general racial animus in the community. The fact that a group of private citizens, organized as the Orleans Board of Trade, voted unanimously to oppose his license and that members of the Board of Selectmen may have attended the meeting established nothing about the motivation of those individuals in opposing his license. The defendants countered his inference with an explanation of the difference between his disco and

> the skating rink which was granted a license. . . .

> In the face of this explanation, plaintiffs' [*sic*] promise that circumstantial evidence would emerge at trial could not withstand the defendants' motions for summary judgment.

*Manego II*, 692 F.2d at 176–77 (footnote omitted).

Despite the two rebuffs, Manego filed yet another lawsuit, this time against the bank, Willard, and the Orleans Board of Trade and its members. The third lawsuit (*Manego III*), which is the subject of this appeal, differed from *Manego II* in two respects: it dropped the Board of Selectmen as a defendant and added the Board of Trade; and it alleged a new legal theory, antitrust violations under the Sherman Antitrust Act, 15 U.S.C. § 1. As evidence of a conspiracy between the bank and the Board of Trade to prevent the proposed disco from competing with the rink, Manego offered depositions, answers to interrogatories, affidavits, and other documents which showed: that Willard was simultaneously an officer of the bank, general manager of the rink, and President of the Board of Trade; that various members of the Board present at the January and February meetings were also Selectmen; that the Selectmen denied the licenses after the Board of Trade voted to oppose their issuance; that the Selectmen subsequently granted an entertainment license to the rink which included live music, dancing and roller disco; and that the bank brought a lawsuit challenging a construction permit granted to Manego by the Orleans Board of Appeal but dropped the lawsuit after it sold the rink. According to Manego, the Board of Trade's interest in preventing the competition between the proposed disco and the rink was derived from the interest of its president, David Willard, who managed the rink for the bank.

Willard and the Bank moved for summary judgment on the grounds that these new claims were barred by the doctrine of *res judicata* and that, in any event, its conduct was protected by the first amendment un-

der the *Noerr-Pennington* doctrine. The Board of Trade also moved for summary judgment under the doctrine of *res judicata* and additionally argued that there was no genuine issue of fact concerning the alleged conspiracy.

## DEFENDANTS CAPE COD FIVE CENTS SAVINGS BANK AND DAVID WILLARD

■ As to Willard and the bank, the district court found that this third lawsuit was barred by the final judgment of the Court of Appeals in *Manego II* affirming the district court's grant of summary judgment to the Bank and Willard on civil rights claims. Applying a "transactional" approach to claim preclusion, the district court found that the facts forming the basis of Manego's claim of antitrust violations were the same as those which formed the basis of his earlier civil rights claims and that they were, therefore, barred by the final judgment against Manego on the civil rights claims. We agree.

While most of our previous cases have involved the preclusive effect of a previous *state* judgment on the merits [1] and have, therefore, been based upon state *res judicata* doctrine, we have indicated that the preclusive effect given to prior judgments by various states does not differ from the preclusive effect we would give to our own judgments. In *Capraro v. Tilcon Gammino, Inc.,* 751 F.2d 56, 58 (1st Cir.1985), we stated that "Rhode Island state law ..., so far as we are aware, does not in connection with the principles of res judicata differ from the Restatement (Second) of Judgments or the law of Massachusetts or federal law." We then turned, as we have in many previous cases, to § 24 of the Restatement (Second) of Judgments (1982) concerning the scope of claim preclusion. It thus appears that, *sub silento,* we have come to view the Restatement rule as our own, even though we have never formally adopted it. *Cf. Mashpee Tribe v. Watt,* 707

F.2d 23 (1st Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 555, 78 L.Ed.2d 728 (1983) (citing § 24 as a source of "elementary principles of res judicata"); *Marrapese v. State of Rhode Island,* 749 F.2d 934 (1st Cir.1984) (citing § 24 as indicative of the "present trend"). We now officially embrace it.

■ Under the doctrine of *res judicata,* "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). This bar is limited, however, to cases arising out of the same cause of action or claim. *E.g., Cromwell v. County of Sac,* 94 U.S. 351, 4 Otto 351, 24 L.Ed. 195 (1876). Our adoption of the Restatement (Second) approach commits us to a "transactional" definition of the underlying claim or cause of action:

(1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar ..., the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

(2) What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

Restatement (Second) of Judgments § 24 (1982).

Manego has argued that *Manego II* does not involve the same transaction as that which formed the basis for *Manego II* for

---

1. *Capraro v. Tilcon Gammino, Inc.,* 751 F.2d 56 (1st Cir.1985); *Casagrande v. Agoritsas,* 748 F.2d 47 (1st Cir.1984); *Roy v. City of Augusta, Maine,* 712 F.2d 1517 (1st Cir.1983); *Isaac v. Schwartz,* 706 F.2d 15 (1st Cir.1983); *Lovely v. LaLiberte,* 498 F.2d 1261 (1st Cir.), *cert. denied,* 419 U.S. 1938, 95 S.Ct. 526, 42 L.Ed.2d 316 (1974).

three reasons: the nature of the conspiracy alleged is different; the parties to the conspiracy are different, although they do share common members; and there was no allegation in *Manego II* that the rink and disco would be offering similar entertainment and thus competing for the same customers.

As the district court pointed out, however, the mere fact that different legal theories are presented in each case does not mean that the same transaction is not behind each. Thus, the fact that one suit alleges a conspiracy with a racial animus and the other alleges a conspiracy with anticompetitive animus does not demonstrate that separate transactions are involved. Nor does it matter in this case that the named defendants are not identical. Even though the Board of Trade was not a defendant in *Manego II*, the fact that it met under the leadership of Willard and voted to oppose the disco was brought out [2] and no new facts concerning conduct of the bank and the Board of Trade have been alleged.

We next consider whether the absence from *Manego II* of the allegation that the bank had plans to offer live music and dancing at the rink was sufficient to prevent the application of *res judicata*. The focus of the argument below was on whether Manego reasonably could have alleged this at the time of the racial discrimination suit. Manego claimed that he did not allege the "similar entertainment" facts in *Manego II* because he did not know of them until too late—three days before summary judgment issued. While it is the law that, if information is not reasonably discoverable, *res judicata* will not apply,

see *Marrapese v. State of Rhode Island*, 749 F.2d 934 (1st Cir.1984), the district court found that this exception was not available here because the "entertainment" facts could have been uncovered if Manego had been diligent in his discovery efforts. The court then went on to reason that because the legal theory which rested upon the "entertainment" facts *could have been* asserted during the prior suit, *res judicata* applied to bar its assertion in a later suit. We believe, however, that, once the reasonable discovery issue is resolved, the focus of a "transactional" analysis is not on whether a second claim *could* have been brought in a prior suit, but whether the underlying facts of both transactions were the same or substantially similar.

There will be situations where the factual bases for separate causes of action are different but intertwined and joining them together is both possible and convenient. A failure to do so, however, will not justify the application of *res judicata*. A good illustration of this can be found in *Landrigan v. City of Warwick*, 628 F.2d 736 (1st Cir.1980), where we held that a law suit charging the police with covering-up an alleged use of excessive force was not precluded by a prior lawsuit based on the actual use of excessive force. The plaintiff in *Landrigan* could have pursued both causes of action in the same lawsuit and it might have been very convenient to do so, since the alleged cover-up was intimately connected to the initial police misconduct. We found, however, that because the factual basis for the cover-up was distinct from the factual basis for the misconduct, the plaintiff was not required to do so. *Id.* at 741. This is to be contrasted with a situa-

---

2. In response to defendants' motion for a more definite statement in *Manego II,* Manego alleged

> that the aforesaid David Willard met, at various times during the periods January 1–January 11, 1979, with certain persons who are described as members of the Orleans Board of Trade, a voluntary association of businessmen and tradesmen in the Town of Orleans, in person, and in communication by telephone and in writing to discuss and act upon ways and means of organizing opposition to and preventing your plaintiff from obtaining li-

censes and other permits required by law for the construction and operation of a disco in the Town of Orleans, Massachusetts, and also that said members of the Orleans Board of Trade met together at various times during the period January 1–January 11, 1979 under the direction of the aforesaid David Willard, President of said association, and "voted" to oppose plaintiff's disco.

Our own opinion in *Manego II* reflects that we were well aware of the Board of Trade's actions. *See supra* p. 4.

tion in which the factual basis for each claim is essentially the same, so that not only *could* both claims be joined in one lawsuit, but *must* be joined or be barred by *res judicata.* A good example is again provided by *Landrigan,* where we held that a prior state court suit for assault and battery precluded a later federal suit under § 1983 for excessive use of force. *Id.* at 740.

The question, therefore, is whether the absence from *Manego II* of an allegation that the bank had plans to offer live music and dancing at the rink creates a transactional difference precluding the application of *res judicata.* Manego now argues that because an allegation that the rink and disco were competitors was essential to provide a motive for a conspiracy to restrain trade, the factual basis for such a conspiracy is distinctly different from that needed to show racial discrimination and that the antitrust action cannot be considered to arise from the same transaction or series of transactions. The answer to this question depends upon whether the underlying facts are the same regardless of the different motives, *i.e.,* racial discrimination and restraint of trade. Aside from motive, the conduct alleged is precisely the same, *i.e.,* the actions of the bank and Willard vis-a-viz the proposed disco. Each alleged conspiracy had the same practical end—keeping Manego from operating the disco—and each used essentially the same means—denial of the licenses, intimidation of building suppliers, and an ultimately withdrawn lawsuit challenging a building permit. This is not a case like *Landrigan* where, although the events in question are closely connected in time and space, two relatively distinct sets of facts can be separated out as the bases for separate legal wrongs. We conclude, therefore, that the difference in motive for the conspiracy does not create a separate transaction.

This means that once Manego chose to allege a conspiracy involving particular specified conspiratorial acts he was required to allege all possible motives for such a conspiracy and all facts necessary to support these allegations or lose the right to do so. Whether he took that risk by failure to discover the facts which diligent effort would have unearthed or by deliberate choice, the result is the same: the antitrust claim is barred by *res judicata* as to the bank and Willard.

## DEFENDANT ORLEANS BOARD OF TRADE

The Board of Trade moved for summary judgment on the grounds that the present suit was barred by the doctrine of *res judicata* and that there was no genuine issue of material fact which would allow Manego to fall under an exception to the *Noerr-Pennington* doctrine. The district court found that *res judicata* did not apply, but that Manego had not alleged facts sufficient to overcome the protection provided by *Noerr-Pennington,* and granted summary judgment for the Board of Trade. The district court's treatment of both these issues was excellent and we see no point in gilding the lily.[3] We affirm the grant of summary judgment to the Board of Trade and its members on the basis of the district court's opinion, *Manego v. Orleans Board of Trade,* 598 F.Supp. 231, 235–40 (D.Mass. 1984).

*Affirmed.*

---

**3.** We recognize that this case is different factually from *Federal Prescription Service v. American Pharmaceutical Ass'n,* 663 F.2d 253 (D.C.Cir. 1981), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982), in that Manego has alleged more than "mere membership" to support his conspiracy claim, but the inferences to be drawn from the Selectmen's attendance at the Board of Trade meeting are still insufficient in these circumstances to rebut the defendants' denials of conspiracy.