Peter A. JOHNSON, Grassy Knoll Associates, Plaintiffs, Appellants,

v.

SCA DISPOSAL SERVICES OF NEW ENGLAND, INC., Waste Management of North America, Inc., Defendants, Appellees.

No. 90–1709.

United States Court of Appeals, First Circuit.

Heard Nov. 9, 1990.

Decided May 2, 1991.

Jonathan S. Springer with whom Robert A. Shaines, Shaines & McEachern, P.A., R. Timothy Phoenix and Hoefle & Phoenix, P.A. were on brief, Portsmouth, N.H., for plaintiffs, appellants.

Philip D. O'Neill, Jr. with whom Andrew L. Matz and Edwards & Angell were on brief, Boston, Mass., for defendants, appellees.

Before BREYER, Chief Judge, BROWN,* Senior Circuit Judge, and CAFFREY,** Senior District Judge.

JOHN R. BROWN, Senior Circuit Judge:

Peter Johnson and Grassy Knoll Associates (collectively referred to as "Grassy Knoll"), of which Johnson is general partner, bring this action against SCA Disposal Services, Inc., and its affiliate Waste Management of North America, Inc. (collectively referred to as "SCA"), seeking damages for the cost of hazardous waste removal ultimately arising out of the sale and lease of a landfill site located on Auburn Road, Londonderry, New Hampshire (the Auburn Road site). The district court found that on account of an earlier, related lawsuit the *res judicata* doctrine barred the litigation and granted summary judgment in SCA's favor. We affirm.

### A Hazardous Deal

The Auburn Road site is a landfill which, prior to the involvement of Grassy Knoll and SCA, had been used both by the Town of Londonderry as the town dump site and as a private disposal. In late 1978 and early 1979, while Grassy Knoll was arranging the purchase of the Auburn Road landfill, SCA engaged in negotiations with Grassy Knoll to lease the site once Grassy Knoll had purchased it. At that point, wary of the legal ramifications of such an acquisition, Grassy Knoll began to rely on SCA to guide Grassy Knoll through the thicket of regulatory problems which preceded commencement of dumping operations at the Auburn Road site. SCA thereafter inspected the site, researched the applicable local, state, and federal regulations, and advised Grassy Knoll regarding the permits which were required to begin dumping operations. In June 1979, after SCA and Grassy Knoll had entered into a long-term prospective lease for the Auburn Road landfill, Grassy Knoll purchased the property from a third party. On July 10, 1979, SCA and Grassy Knoll entered into a second lease which superseded the earlier prospective lease.[1]

No sooner had Grassy Knoll sown the seeds for the restoration of dumping operations at the Auburn Road site than bureaucratic weeds sprouted choking its efforts to obtain the necessary local permits. State permission to operate was uprooted as well when, in October 1979, the New Hampshire Attorney General's office notified Grassy Knoll that it had discovered that the site had previously been used for the dumping of hazardous and chemical waste. Although neither SCA nor Grassy Knoll was responsible for these odious acts, in order to further cultivate its relationship with Grassy Knoll, SCA intervened in Grassy Knoll's behalf and notified town and state officials that it would correct any hazardous waste problems in conjunction with its preparation of the site as a sanitary landfill.

Beginning in 1981, the U.S. Environmental Protection Agency (EPA) conducted its own preliminary hazardous waste site assessment and in 1983 placed the Auburn Road site on its National Priorities List, but at that point took no action to require that cleanup efforts commence. The local landfill permit was still not forthcoming, however, and, despite its promise, SCA took no significant steps to eliminate the presence of hazardous and chemical waste. Nevertheless, Grassy Knoll continued to rely upon SCA's representations that it could and would clean any hazardous waste on the site as part of its landfill operation.

EPA's more intensive investigation germinated in early 1985 and, one year later, the agency notified Grassy Knoll that it was potentially liable for all or part of any cleanup costs which EPA might incur in ridding the Auburn Road site of hazardous waste.[2] Drowning both from the storm of

---

* Of the Fifth Circuit, sitting by designation.

** Of the District of Massachusetts, sitting by designation.

1. Under the lease between Grassy Knoll and SCA, SCA was to have sole control of the operation of the landfill.

2. EPA's March 13, 1986, letter to Grassy Knoll's counsel stated in part:

    [At the March 10, 1986, meeting,] [t]hree issues were discussed: (1) participation by your client in barrel stabilization/removal at the site; (2) construction by your client of a

administrative troubles and the difficulties posed by the discovery of hazardous waste, Grassy Knoll's seedling plans to bring dumping back to the Auburn Road site have never budded.

## GKA I

In August 1984, Grassy Knoll filed two state court actions against SCA (*GKA I*), seeking damages for negligent misrepresentation by SCA and a declaratory judgment rescinding the Auburn Road site lease. Grassy Knoll sought to recoup legal fees expended in reliance on SCA's regulatory advice, lost profits for the time that the Auburn Road landfill remained dormant,[3] and other damages. Both diversity actions were removed to federal district court, which exercised diversity jurisdiction, and the parties commenced discovery in the consolidated suit in the spring of 1986. During that period, which ended October 13, 1986, Grassy Knoll indicated[4] that actual and potential cleanup costs would be included among the miscellaneous damages it would seek at trial.

On October 9, 1986, Grassy Knoll moved to amend its complaint to include a $10,-000,000 claim for cleanup costs related to the EPA investigation. Grassy Knoll stated that the discovery of hazardous waste on the landfill premises "gave rise to a second but related cause of action arising out of the same transactions which gave rise to the pending litigation." This motion came on the eve of trial, more than two years after the suit's filing, over seven months after the EPA had first notified Grassy Knoll that it might be liable for various costs associated with cleanup of hazardous waste at the Auburn Road site,[5] and well after the deadline for any such action had passed.[6] On October 22, 1986, the trial court denied the motion to add the EPA cleanup count as untimely filed, and the case went to trial as scheduled on November 3, 1986. The jury returned a verdict in Grassy Knoll's favor and awarded damages, not including any amounts sought in the rejected proposed amendment. The court entered judgment accordingly on March 31, 1987. Neither party appealed any of the court's orders.

## GKA II

Nearly a year and a half later, on August 3, 1988, Grassy Knoll commenced in federal district court a second diversity action against SCA (*GKA II*).[7] In effect

---

fence around the source areas of the site; and (3) participation by your client in future remedial actions at the site. Information was provided to you as to why barrel stabilization/removal and fence construction was necessary to abate an imminent and substantial endangerment, what such actions would involve, and when such actions had to be undertaken.

... You were informed that such work would have to be done under an EPA administrative consent order. *You were further informed that EPA would undertake these actions if your client could not do so.* In addition, you were told that *your client, as the current owner of the site, is potentially liable for the cost of such EPA response actions* taken at the site under CERCLA, 42 U.S.C. § 9606, *et seq.*

(Emphasis added.)

3. Rent under the Grassy Knoll/SCA lease was $1.00 per month. The modified term generating profits for the lessor Grassy Knoll factored rent at $1.25 per each ton of solid waste disposed at the landfill (when the approvals necessary for operation were obtained).

4. After having been made aware that Grassy Knoll could be "potentially liable for the cost of such EPA response actions taken at the site under CERCLA" as hazardous waste container stabilization/removal and fence construction, *see supra* note 2, Johnson testified by deposition that he intended to seek damages related to the cleanup of the site, including legal and engineering fees, in this lawsuit.

5. *See supra* note 2.

6. Fed.R.Civ.P. Rule 15(a) provides:

A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires....

*See also infra* note 19.

7. Also named as a defendant was SCA's affiliate, Waste Management of North America, Inc., which was not a party to *GKA I.* To avoid

attacking the district court's order disallowing the amendment in *GKA I,* Grassy Knoll claimed in its complaint that it was denied an opportunity to bring an action for cleanup costs resulting from the EPA's ongoing investigation in *GKA I* and therefore was doing so in *GKA II.* The complaint also stated that SCA was precluded from relitigating factual issues related to SCA's liability for the damages it sought in the second suit because these issues were *res judicata* from *GKA I.*[8] Finally, although final judgment in *GKA I* was rendered on March 31, 1987, Grassy Knoll stated that *GKA II,* "[i]n effect, ... is merely the continuation of the previous law suit."

In an order entered May 7, 1990, the trial court granted summary judgment in SCA's favor dismissing *GKA II* on *res judicata* grounds. Alternately applying this Circuit's and New Hampshire's *res judicata* doctrines, the court found that the second action was barred under either law, federal or state, because it was part of the same "transaction" which gave rise to *GKA I.* *See Manego v. Orleans Bd. of Trade,* 773 F.2d 1, 5 (1st Cir.1985). With regard to Grassy Knoll's tardy amendment in the first suit, the trial court stated that Grassy Knoll "had sufficient opportunity [timely] to amend their complaint ... in *GKA I* by adding the issues now before this Court." The court further declared that no extenuating circumstances justified an exception to the summary judgment dismissal: "That [Grassy Knoll] chose to wait until the eve of trial [to move to amend] and were denied an opportunity to litigate these claims in *GKA I* is not an extenuating circumstance; it was wholly within plaintiffs' power to prevent."

### The View From Grassy Knoll

On appeal, Grassy Knoll initially urges that the district court erred in its analysis of whether federal or state law applied to the determination of the preclusive effect of *GKA I.* It states that New Hampshire law of *res judicata* should govern this diversity suit and that that state's law would allow *GKA II* to go forward. Grassy Knoll has also changed its story in certain respects. First, Grassy Knoll contends that, if federal law applies, the facts which are the basis of *GKA II* are not part of the same transaction as *GKA I.*[9] Also, in stark contrast to representations it made in the text of its attempted amendment to the *GKA I* complaint,[10] Grassy Knoll now argues that its motion to amend was imperfect because it was not ripe—that the trial court rejected the amendment in the first suit not because it was too late but because the claim was premature.

These new positions bear on Grassy Knoll's fundamental contention that *res judicata* principles should not preclude *GKA II.* Finally, Grassy Knoll makes an equitable plea that this Court allow the suit to go forward even if it is *res judicata.* On this argument, Grassy Knoll balks in the face of the Supreme Court's strong position against relaxing federal law claim preclusion principles, despite extenuating

confusion, we will continue to refer to the defendants in *GKA II* collectively as "SCA".

8. The complaint in *GKA II* states:
   Plaintiffs' theory of liability on the part of the Defendant with respect to Plaintiffs' damages for the cleanup of hazardous wastes, and indemnification of the Plaintiffs for expenditures incurred in response to hazardous waste cleanup and/or allegations and orders of the EPA are exactly the same as in the previous action.

9. Contrast this position to Grassy Knoll's statements in its complaint in this very lawsuit. *See supra* note 8.

10. The damages claim asserted in the proposed amendment was grounded in the indemnity provision, Article XIV, of the July 1979 Grassy Knoll/SCA lease of the Auburn Road site. Grassy Knoll further stated in its proposed amendment, in relevant part:

   4. ... pursuant to the terms of the lease, [SCA] was responsible for site preparation which would permit the site to be operated as a landfill. Upon the discovery of hazardous waste on the property, it would be necessary for said hazardous waste to be cleaned up prior to permission from the State and/or Federal Government to operate the site as a sanitary landfill. Since the site must be cleaned, the hazardous waste cleanup becomes part of the site preparation for which [SCA] is contractually responsible....

equitable considerations, *see Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 401, 101 S.Ct. 2424, 2429, 69 L.Ed.2d 103, 110–11 (1981), and essentially admits that any chance for an exception in this case lies only if New Hampshire law applies.

### Federal Law Applies

We first decide the choice of law question, which determines the framework of the discussion which follows. Grassy Knoll asserts that in this Circuit principles of state law determine the preclusive effect of a prior judgment of a federal court exercising diversity jurisdiction. However, neither of the cases upon which Grassy Knoll relies, *see Lynch v. Merrell–National Laboratories*, 830 F.2d 1190 (1st Cir. 1987); *Standard Accident Insur. Co. v. Doiron*, 170 F.2d 206 (1st Cir.1948), directly supports its position. *Standard Accident* applied state principles of *res judicata* to a diversity suit where it was asserted that a prior *state* judgment estopped a second action. *See* 170 F.2d at 207. And in *Lynch* this Court expressly reserved the question because in that situation "the same result would follow under either federal or state law." 830 F.2d at 1192.

■ In this case, the lower court took a tack similar to *Lynch* and held that New Hampshire and federal law on the subject would yield the same result. Although Grassy Knoll makes a persuasive argument that the result would be different under New Hampshire law, which it contends is more favorable to its position, we need not address the question because we now adopt the rule that, in diversity cases, federal law governs the preclusive effect of prior federal judgments. This is the position of most of the other Circuit Courts of Appeals [11] and one this Court implicitly has taken before. *See Dowd v. Society of St. Columbans*, 861 F.2d 761, 763 (1st Cir.

1988). We agree with the Second Circuit's statement in *Kern*, 303 F.2d at 340, that:

> One of the strongest policies a court can have is that of determining the scope of its own judgments.... It would be destructive of the basic principles of the Federal Rules of Civil Procedure to say that the effect of a judgment of a federal court was governed by the law of the state where the court sits simply because the source of federal jurisdiction is diversity.... [I]t would be strange doctrine to allow a state to nullify the judgments of federal courts constitutionally established and given power also to enforce state created rights.

Thus, we formally adopt the rule that federal law of *res judicata* governs the effect of a prior federal judgment in a diversity case.

### Applying the Federal Law

■ This Circuit's approach to *res judicata* questions requires us to evaluate whether *GKA II* involves the same "transaction" which forms the basis for the underlying claim or cause of action—*GKA I. See Manego*, 773 F.2d at 6. Grassy Knoll argues that the second suit is not barred by the transactional rule for two reasons. First, Grassy Knoll asserts that *GKA II* involves the new claim of damages from the ongoing EPA investigation, requiring separate proof and discovery. Second, Grassy Knoll contends that the EPA-related claim did not become ripe until after damages were sustained, which it alleges occurred after the conclusion of *GKA II.*

#### (i) *Part of Same Transaction?*

Even though Grassy Knoll would be forced to put on new evidence regarding the damages it has sustained and will suffer from the expected EPA cleanup order and EPA liability, a second suit is nonetheless precluded. *GKA II* was filed be-

11. *See Shoup v. Bell and Howell Co.*, 872 F.2d 1178, 1179 (4th Cir.1989); *Smith v. Safeco Insur. Co.*, 863 F.2d 403, 404 (5th Cir.1989); *Petromanagement Corp. v. Acme–Thomas Joint Venture*, 835 F.2d 1329, 1333 (10th Cir.1988); *Precision Air Parts, Inc. v. Avco Corp.*, 736 F.2d 1499, 1503 (11th Cir.1984); *Hunt v. Liberty Lobby, Inc.*, 707 F.2d 1493, 1496 (D.C.Cir.1983); *Silcox v. United Trucking Serv., Inc.*, 687 F.2d 848, 852 (6th Cir. 1982); *Kern v. Hettinger*, 303 F.2d 333, 340 (2d Cir.1962). *See also*, 1A J. Moore, Moore's Federal Practice ¶ 0.311[2], at 3179–83 and n. 28 (2d ed.1982).

cause Grassy Knoll failed in *GKA I* to claim damages arising from cleanup of the Auburn Road site. Moreover, it was not allowed to do this by the proposed amendment. There is no question but that the instant case is closely "related in time, space, origin, ... [and] motivation" and that the two actions "form a convenient trial unit ... conform[ing] to the parties' expectations...." *Manego*, 773 F.2d at 5 (*quoting* Restatement (Second) of Judgments § 24 (1982)). Indeed, Grassy Knoll's statements in both the proposed amendment [12] and the second complaint [13] make clear that the two suits arose from the same bungled lease deal with SCA. Therefore, *res judicata* principles certainly apply, even though the exceptionally high dollar claim springs from environmental concerns involving complex federal statutes which impose almost unlimited liabilities on those who at one time or another have some ownership interest in or activity involving the now-contaminated property.

Although *res judicata* applies, we do not accept the Grassy Knoll view that only the liability portion of *GKA I* is precluded.[14] *GKA I* determined liability *and* awarded damages, and a second suit for additional, but quite different, damages is thereby barred. *See* Restatement (Second) of Judgments § 25, comment c.[15] Grassy Knoll

had ample opportunity to timely amend its complaint in *GKA I* after first being notified by EPA that Grassy Knoll might be held liable for cleanup costs.[16] There is at least some evidence that the initial failure to include cleanup costs in its claim for damages was a calculated tactical decision on Grassy Knoll's part.[17] However, whatever the reason for Grassy Knoll's dilatoriness, it has proven to be fatal to *GKA II*, and we decline to reward Grassy Knoll for its own delinquency by permitting *GKA II* to go forward. *See Petromanagement Corp. v. Acme–Thomas Joint Venture*, 835 F.2d 1329, 1334 (10th Cir.1988) ("[t]he [trial] court's refusal to consolidate, like a court's denying leave to amend, does not eliminate the possibility of claim preclusion as to the untimely issues excluded"); *Nilsen v. City of Moss Point*, 701 F.2d 556, 563 (5th Cir.1983) (second related claim untimely advanced in first suit not open to reexamination in second suit). *See also, Isaac v. Schwartz*, 706 F.2d 15, 17 (1st Cir.1983) (applying Massachusetts law of *res judicata*, identical to federal transactional approach, stating that failure to timely amend to add transactionally related claims not an excuse for second suit); Restatement (Second) of Judgments § 25, comment b.[18]

**12.** *See supra* note 10.

**13.** In its complaint in *GKA II*, Grassy Knoll states that its "theory of liability ... [is] exactly the same as in the previous action." *See supra* note 8.

**14.** *See supra* note 8.

**15.** Comment c provides:

Typically, even when the injury caused by an actionable wrong extends into the future and will be felt beyond the date of judgment, the damages awarded by the judgment are nevertheless supposed to embody the money equivalent of the entire injury. Accordingly, if a plaintiff who has recovered a judgment against a defendant in a certain amount becomes dissatisfied with his recovery and commences a second action to obtain increased damages, the court will hold him precluded; his claim has been merged in the judgment and may not be split....

*Id.* (emphasis added).

**16.** *See supra* note 2.

**17.** An August 7, 1985, internal memorandum by Grassy Knoll's counsel regarding a document production request from SCA indicated that Grassy Knoll decided to withhold certain documents regarding cleanup costs for strategic reasons. The memorandum states:

The only additional documents that I thought we might want to produce would be in response to request for production 15, where they ask for documents which indicate that the property has little value other than as private or public sanitary landfill. In that regard, I thought we could produce some of the Goldberg Zoino cleanup documents which estimate it at a cost of $15,000,000. Peter and I discussed that, and we both felt that that was certainly a two-edged sword, since we are claiming damages of $8,000,000; obviously, the site could not be used to produce income if it had been shut down because of hazardous waste being found on it....

**18.** Comment b states in pertinent part:

... It is immaterial that the plaintiff in the first action sought to prove the acts relied on in the second action and was not permitted to

Under these circumstances, Grassy Knoll at the end of *GKA I* should have appealed the trial court's denial of Grassy Knoll's motion to amend. It is widely accepted that appeal is the plaintiff's only recourse in such a situation.[19]

### (ii) *Ripeness of the Claim*

Grassy Knoll's ultimate excuse that the EPA-related claims did not become ripe until after Grassy Knoll expended funds under EPA orders to clean up the Auburn Road site (which occurred after the conclusion of *GKA I*) is equally unpersuasive. Grassy Knoll's claim for negligent misrepresentation in the purchase of the Auburn Road site was clearly ripe and litigated in *GKA I*. Grassy Knoll contends, however, that *GKA II* is only for cleanup costs which would be incurred in response to EPA's warnings and threats of potential liability. First, Grassy Knoll asserts that, lacking a formal EPA cleanup *order*, litigation over damages resulting from cleanup expenses in response to EPA actions was unripe. Second, Grassy Knoll maintains that the trial court really denied its attempt to amend because it was unripe, rather than for tardiness reasons.

Grassy Knoll admits that, through its formal pleadings in *GKA I*, it sought damages for the cost of cleanup-related activities ordered by the State of New Hampshire. That Grassy Knoll seeks "EPA-related" damages rather than "state-related" cleanup costs and lost profits does not alter the fact that the two actions are transactionally related for *res judicata* purposes. *See Manego*, 773 F.2d at 6 (emphasis less on what *could* have been brought in prior suit than on whether the bases for the two suits are transactionally related).[20] It is further clear to us that the EPA-related damages were sufficiently real well before *GKA I* came to trial. Some seven months prior to Grassy Knoll's October 1986 attempt to include EPA-related cleanup damages in *GKA I*, the EPA notified Grassy Knoll and its counsel in strong terms that Grassy Knoll was potentially liable for certain cleanup costs.[21] Certainly Grassy Knoll's counsel at least had professionally imputed, if not actual, knowledge of the liability under the far-reaching statutes implicated in such a warning. We fail to see how Grassy Knoll's finally spending money on cleanup-related expenditures automatically makes the claim ripe.[22] Accordingly, we hold that the EPA-related claim for damages is transactionally inseparable

---

do so because they were not alleged in the complaint *and an application to amend the complaint came too late.*
*Id.*

**19.** *See* 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4412, at 104–05 (1981) ("[F]or the most part such errors should be corrected by appeal in the first proceeding. Denial of leave to amend to assert all parts of a claim partially asserted at the outset of the first action ... should preclude a second action...."). In such an appeal, the unchallenged circumstance of a likely ruling of *res judicata* would have been a powerful factor in favor of reversal in view of F.R.Civ.P. Rule 15, which mandates that "leave [to amend] shall be freely given when justice so requires."

**20.** While this Court recognizes that, "if information is not reasonably discoverable, *res judicata* will not apply," *Manego*, 773 F.2d at 6, a party's *actual knowledge* of a potential claim is not necessary for claim preclusion purposes. *See* Restatement (Second) of Judgments § 25, comment c, which provides:

... It is immaterial that in trying the first action [the plaintiff] was not in possession of

enough information about the damages, past or prospective, or that the damages turned out in fact to be unexpectedly large and in excess of the judgment.
*Id.* *See also, Harnett v. Billman*, 800 F.2d 1308, 1313 (4th Cir.1986) ("Actual knowledge of a potential claim is not a requirement for application of the rules of merger and bar, however; rather, the appropriate inquiry is whether the new claim arises out of the same transaction...."); *Diaz v. Indian Head, Inc.*, 686 F.2d 558, 563 (7th Cir.1982) (*res judicata* bars second suit where claim could have been raised in first action, even where amount allegedly owing was not then certain).

**21.** *See supra* note 2 (emphasized language).

**22.** Grassy Knoll contends that the suit is currently ripe because EPA ordered it to bear the cost of erecting a fence around the hazardous waste source areas of the Auburn Road site. However, in the March 1986 letter, EPA stated that Grassy Knoll was potentially liable for erecting the fence or for reimbursing EPA, if it was forced to do so. *See supra* note 2.

from and should have been timely sought in *GKA I.*

We reject also Grassy Knoll's assertion that the trial court's dismissal of its motion to amend was based on ripeness rather than tardiness grounds, and that, therefore, the claim was not dismissed on the merits. We think that the plain words "untimely filed" in the court's October 22, 1986, order and the context of its ruling unquestionably yields the conclusion that the trial court considered Grassy Knoll's amendment "too late," since in the paragraph that follows the phrase the court denies another pretrial motion because it was "untimely filed and will serve only to delay the case." The trial court was right on the nose in this short summary: "[t]o say that ['untimely filed'] meant 'unripe' in one paragraph and 'too late' in the next is not a reasonable construction of the document as a whole." [23]

### No Pardon

Finally, under federal law, we cannot relax the principles of claim preclusion even if we find that the equities cry out for us to do so. As the Supreme Court declared in *Federated Department Stores, Inc. v. Moitie,* "[t]here is simply 'no principle of law or equity which sanctions the rejection by a federal court of the salutary principle of *res judicata.'*" 452 U.S. at 401, 101 S.Ct. at 2429, 69 L.Ed.2d at 110 (*quoting Heiser v. Woodruff,* 327 U.S. 726, 733, 66 S.Ct. 853, 856, 90 L.Ed. 970). *See also, Rose v. Town of Harwich,* 778 F.2d 77, 82 (1st Cir.1985) (*Federated* prohibits any "ad hoc determination of the equities in a particular case" in which traditional *res judicata* principles apply) (*quoting Federated*).

### Down in the Dumps

In sum, we are closely confined by the applicable principles of claim preclusion to hold that *GKA II* is precluded by the final judgment in *GKA I.* The district court's

summary judgment dismissal of *GKA II* was therefore correct.

AFFIRMED.

---

**23.** We also reject Grassy Knoll's argument that SCA's opposition memorandum supported Grassy Knoll's assertion that its claim was unripe. While it is true that SCA's opposition mentioned ripeness as an alternative argument to lateness, only the trial court's written order disposed of the motion, and SCA's memorandum has no value for purposes of review.