### LUBE 495, INC.
v.
### JIFFY LUBE INTERNATIONAL, INC., Pennzoil Products Company.

#### Civ. A. No. 92–10286–WF.

United States District Court,
D. Massachusetts.

Feb. 5, 1993.

Joseph L. Kociubes, Patricia M. McCarthy, Bingham, Dana & Gould, Boston, MA, for plaintiff.

Joseph D. Steinfield, Neil V. McKittrick, Hill & Barlow, Boston, MA, Christine E. Lanzon, Peter J. Klarfeld, Brownstein, Zeidman & Schomer, Washington, DC, for defendants.

MEMORANDUM AND ORDER ON MOTION OF DEFENDANTS JIFFY LUBE INTERNATIONAL, INC. AND PENNZOIL PRODUCTS COMPANY FOR PARTIAL SUMMARY JUDGMENT (# 17)

COLLINGS, United States Magistrate Judge.

## I. INTRODUCTION

In February of 1992, plaintiff Lube 495, Inc. ("Lube 495") filed a nineteen count complaint against two named defendants, Jiffy Lube International, Inc. ("JLI") and Pennzoil Products Company ("PPC"). According to the allegations of the complaint, JLI is the franchisor of the largest chain of fast oil change and lubrication stores in the nation. Defendant PPC purportedly controls JLI by virtue of owning all the stock of that corporation.[1] Lube 495, a franchisee of JLI, owns and operates "Jiffy Lube" fast oil change and lubrication service centers in Massachusetts and Rhode Island. This action arises out of the defendants' alleged breaches of license and area development agreements, fiduciary duties, and implied covenants of good faith and fair dealing. Lube 495 further alleges that the defendants engaged in tortious interference, acts of misrepresentation, and other unfair and deceptive acts and practices.

Within a short period after interposing both an answer and a counterclaim to Lube 495's complaint, JLI and PPC filed the motion for partial summary judgment which is presently before the Court. The defendants' motion seeks judgment as a matter of law on fifteen of the nineteen claims alleged in the complaint. Lube 495 opposes the defendants' motion. Pursuant to Title 28 U.S.C. § 636(c), the parties have consented to having the defendants' dispositive motion referred to the undersigned for a ruling.

As the primary basis for their motion, JLI and PPC contend that the majority of counts in the instant complaint are barred by the doctrine of res judicata. To place the arguments in context, an historical view must be taken in order to understand the relationship between the present allegations and those advanced in the prior litigation.

## II. "PENNZOIL COMPANY" OR "PENNZOIL PRODUCTS CORPORATION"

Before delving into the background of this litigation, a certain confusion with re-

---

1. The defendants deny this allegation, affirmatively stating that all or virtually all of the stock of JLI is owned by Pennzoil Company which is not a party to this action.

spect to the players involved must be addressed. Footnote one foreshadows this conundrum which is rooted in Lube 495's shorthand denomination of the defendant Pennzoil Products Company as "Pennzoil." As noted hereinabove, the defendants deny that Pennzoil Products Company owns the majority of the stock of JLI. In his affidavit, Richard L. Zdankewicz, the manager of planning and finance for Pennzoil Products Company, avers that Pennzoil Company, the parent of PPC, acquired 80% of the stock of JLI in January of 1990. (# 19, Zdunkewicz Affidavit, para. 1, 2)

In its Statement of Disputed Material Facts, Lube 495 distinguishes between Pennzoil Company and Pennzoil Products Company, acknowledging that the former is the majority owner of JLI and, consequently, controls JLI. (# 31, *compare* para. 4 and 5 with para. 9) No such differentiation is made in the text of the complaint. The result is that the plaintiff's statement of disputed facts is at odds with the allegations of the complaint which, given the abbreviated designation "Pennzoil," must be read to contend that in January of 1990, Pennzoil Products Company, not Pennzoil Company, acquired an 80% interest in JLI.

Lube 495 addresses this issue by means of a footnote in its opposition to the motion for summary judgment. (# 30, footnote 15) Therein the plaintiff states that whether "Pennzoil Company instead of Pennzoil [Products Company] owns the stock of JLI ... is irrelevant" because the issue is control not necessarily ownership. (*Id.*) The Court does not view the veracity of Lube 495's factual allegations to be "irrelevant." When drafting a complaint in compliance with Rule 11, Fed.R.Civ.P., the signer certifies that to the best of his/her knowledge, information and belief formed after reasonable inquiry, the allegations are well grounded in fact. In this instance, the plaintiff's apparent cavalier attitude regarding the accuracy of its allegations has only added to the complexity of an already complicated case. Whether Lube 495's

manner of pleading impacts the merits of this dispositive motion shall be addressed if and when the issue arises.

## III. BACKGROUND

### A. The Prior Litigation— The Association's Suit

Returning to the factual background, Jiffy Lube Association of Franchisees, Inc. ("the Association"), a Delaware corporation, is the only organized association of Jiffy Lube franchisees in the United States. (# 19, Appendix, Exh. 2, para. 5) In September of 1990, the Association filed a four count complaint against Jiffy Lube International, Inc. ("JLI") and Pennzoil Products Company ("Pennzoil Products") in the United States District Court for the District of Massachusetts.[2]

According to the allegations of the Association's complaint, over the past decade or so, the quick lube business blossomed, becoming one of the fastest growing market segments in the automotive service and supply industry. (# 19, Exh. 2, para. 7) The Jiffy Lube quick lube operation, the largest in the nation, expanded during this period, developing a substantial amount of good will and consumer recognition. (# 19, Exh. 2, para. 8) Among Jiffy Lube's competitors are the more than five hundred independent quick lube centers which market their services under the name "Pennzoil Ten Minute Oil Change" as well as the hundreds of other independent quick lube centers that use the Pennzoil trade name. (*Id.*) The Association claimed that Pennzoil Products has not only encouraged the development of this network of independent quick lube service centers ("Pennzoil Independents"), it has worked at developing quick lube service centers at automobile dealerships which then display a "Pennzoil Fast Oil Change" sign. (*Id.*)

The vast majority of Jiffy Lube centers are owned and operated by franchisees of JLI. (# 19, Exh. 2, para. 3) Each Jiffy Lube franchisee is required to execute a license agreement with JLI that details the

---

**2.** Not to muddy the waters further, but Pennzoil Products Company is denoted as "Pennzoil

Products" throughout the body of the prior complaint.

terms and conditions pursuant to which a Jiffy Lube service center may be established. (# 19, Exh. 2, para. 12) The rights and obligations by and between JLI and the Jiffy Lube franchisees were standardized in 1985 when the Association negotiated a Model License Agreement with JLI. (*Id.*)

*Inter alia*, the terms of the license agreement provide as follows:

(a) JLI "will continue to develop valuable good will in the service mark and trade name 'Jiffy Lube' ";

(b) JLI shall maintain and administer the National Advertising Fund ("NAF") "to maximize general public recognition and acceptance of the [JIFFY LUBE] Mark for the benefit of the [Jiffy Lube] System";

(c) JLI shall "not itself develop another system offering fast oil change and lubrication services for automobiles and light duty trucks and allow them to operate in competition with the Jiffy Lube Service Center licensed hereunder in the area of exclusivity granted Licensee";

(d) the franchisee is free to purchase approved equipment, products and supplies "from whomever Licensee in its own discretion decides";

(e) JLI is obligated to assist the franchisee "in locating suppliers whose products meet the required specifications" and to "negotiate volume purchasing arrangements for those products and supplies and offer them at a reasonable mark-up to licensees";

(f) JLI is obligated to furnish Jiffy Lube franchisees certain services, including, among others, standardized procedures of operation, training programs and related assistance, standardized accounting procedures, reports of improvements in business and merchandizing methods, field supervision and consultation, site location assistance, assistance in planning local advertising and a continuing advertising campaign; and

(g) JLI is obligated to furnish to Jiffy Lube franchisees a Policies and Procedures Manual "describing the System and its standard operating procedures" and other manuals developed by JLI,

which are proprietary to the Jiffy Lube System and are to be kept "secret and confidential."

(# 19, Exh. 2, para. 13)

The Association alleged that these terms, in substantially similar form, are incorporated in each of the license agreements executed by its member franchisees with JLI. (# 19, Exh. 2, para. 14)

In March of 1988, JLI entered into a Strategic Alliance Agreement ("SAA") with Pennzoil Products, pursuant to which JLI agreed to "designate Pennzoil brand motor oil as the 'oil of choice' for the entire [Jiffy Lube] system." (# 19, Exh. 2, para. 15, 16) In furtherance of this provision, JLI was required to "use its very best efforts, all reasonably available personnel, and appropriate resources to make Pennzoil the oil of choice for the [Jiffy Lube] Systems" and "[r]ecommend and encourage the use of Pennzoil brand motor oil to all present and future Jiffy Lube franchisees." (# 19, Exh. 2, para. 16) On its part, Pennzoil Products agreed to pay JLI a "sponsorship fee" for each gallon of motor oil purchased by JLI or Jiffy Lube franchisees. (# 19, Exh. 2, para. 17)

Among the other terms of the SAA was a provision with respect to advertising. (# 19, Exh. 2, para. 19) In exchange for a contribution by Pennzoil Products to JLI's National Advertising Fund ("NAF") of a sum certain for every gallon of motor oil purchased by Jiffy Lube Centers, JLI agreed to promote the Pennzoil name in all advertisements produced by NAF. (*Id.*)

It was acknowledged that a "major inducement" to JLI for entering into the SAA was "the prospect that a substantial number of Pennzoil supplied Independent [quick lube] Centers will agree to become Jiffy Lube franchisees as the result of Pennzoil's efforts to introduce JLI to such Independents and convert such Independents to Jiffy Lube franchisees." (# 19, Exh. 2, para. 29) To that end, Pennzoil Products agreed to use its "very best efforts, and appropriate resources . . . to support and bring about as many such conversions as possible." (*Id.*) Pennzoil Products further agreed to "discontinue future

use of its 10–Minute Oil Change sign program ... and other support programs" and not to "operate any company-owned [quick lube] Centers (except as a Jiffy Lube franchisee), nor franchise any Centers, in the United States of America" during the term of the agreement. (# 19, Exh. 2, para. 21)

While the SAA was intended to benefit Jiffy Lube franchisees, the Association alleged that, in fact, it altered the rights of the franchisees and the obligations of JLI under the License Agreement. (# 19, Exh. 2, para. 23) In light of the franchisees' concerns, the Association and JLI negotiated an agreement that was executed by them on March 17, 1989. (# 19, Exh. 2, para. 28) JLI agreed to renegotiate the SAA and that "[the Association] will be made a part of the approval process for the renegotiation." (# 19, Exh. 2, para. 29) Moreover, JLI agreed to provide certain monetary benefits for the Jiffy Lube franchisees to ameliorate financial unfairness perceived in the terms of the SAA. (# 19, Exh. 2, para. 30)

By the terms of the March 1989 Agreement, JLI also agreed "that no person, firm or corporation will be permitted by JLI to establish or operate, nor will JLI itself establish or operate, a business under the Jiffy Lube System on any site within two (2) miles of any franchisee's Jiffy Lube Service Center." (# 19, Exh. 2, para. 31) Finally, provision was made requiring that the Association "be informed in advance of, and represented at, any and all negotiations that concern either the possible sale, merger or restructuring of JLI, or any other extraordinary transaction likely to affect the future performance of JLI's obligations to its franchisees." (# 19, Exh. B, para. 33)

On March 20, 1989, with the president of the Association in attendance, representatives of JLI and Pennzoil Products met to discuss amending the SAA. (# 19, Exh. B, para. 34) Pennzoil Products proposed changes that purportedly would be to its own benefit and to the further detriment of the Jiffy Lube franchisees. (# 19, Exh. B, para. 35) The president of the Association strongly objected to the proposed amendments. (# 19, Exh. B, para. 36) Despite the Association's objections, JLI agreed to the proposed amendments which were incorporated in a letter agreement dated April 4, 1989 between JLI and Pennzoil Products. ("the SAA Amendments") (# 19, Exh. B, para. 38)

The Association alleged that in July of 1990, Pennzoil Company acquired an 80% interest in JLI. (# 19, Exh. B, para. 41) JLI did not inform the Association of the acquisition in advance as required by the terms of their March 1989 Agreement. (# 19, Exh. B, para. 42) In the corporate reorganization following the acquisition, Pennzoil Company officers and managers were given dual responsibility for both Pennzoil's Quick Lube Operations and the Jiffy Lube System. (# 19, Exh. B, para. 43) This joint JLI/Pennzoil management allegedly gave rise to serious conflicts of interest to the detriment of Jiffy Lube franchisees. (# 19, Exh. B, para. 44) For example, through "brand fusion" advertising, JLI/Pennzoil management purportedly sought to link the name Jiffy Lube with the name Pennzoil. (# 19, Exh. B, para. 46)

Based on these facts, in Count I of its complaint, the Association alleged the JLI materially breached its obligations under the March 1989 Agreement, including its duty of good faith and fair dealing. (# 19, Exh. B, para. 49) In Count II, it was alleged that Pennzoil Products tortiously induced JLI to breach the March 1989 Agreement with the Association by demanding that JLI execute the SAA Amendments without the Association's participation and approval. (# 19, Exh. B, para. 54) In Count III against both JLI and Pennzoil Products, the Association sought a declaration that the SAA amendments were null and void as well as an injunction requiring Pennzoil Products and JLI to abide by the original SAA until it was duly amended with the approval of the Association. Finally in Count IV against JLI, the Association, as the representative of its member franchisees, sought a declaration that JLI had materially breached, and continued to breach, its obligations to the Jiffy Lube franchisees, including its duty of good faith and fair dealing, by:

(a) allowing JLI's president and other JLI officials and senior management to serve in dual capacities, overseeing both the Jiffy Lube System and the development and expansion of competing Pennzoil quick lube service centers, creating an inherent conflict of interest to the detriment of the Jiffy Lube franchisees;

(b) making the knowledge and proprietary information of the Jiffy Lube System and the Jiffy Lube franchisees available for the benefit of competitors of the Jiffy Lube franchisees to the detriment of those franchisees;

(c) allowing JLI's president and other JLI officials and senior management to favor the Pennzoil quick lube service centers over the Jiffy Lube centers by, among other things, providing them, free of charge, with many of the services that JLI provides to Jiffy Lube franchisees only in exchange for the payment of substantial royalties and franchise fees;

(d) permitting, authorizing and supporting the establishment and operation of competing quick lube service centers within the areas of exclusivity granted to Jiffy Lube franchisees;

(e) inhibiting and impeding the ability of Jiffy Lube franchisees to choose among the competing brands of motor oil and to purchase motor oil from suppliers other than Pennzoil Products by making Pennzoil the "oil of choice" in the Jiffy Lube System and seeking, through brand fusion advertising and other means, to have the public associate the name "JIFFY LUBE" with "PENNZOIL";

(f) promoting the PENNZOIL name at the expense of the continued development of good will in the JIFFY LUBE name and failing to maximize general public recognition of the JIFFY LUBE name;

(g) failing to locate sources of products and supplies and to negotiate volume purchasing arrangements for Jiffy Lube franchisees and to offer such products and supplies at reasonable mark-ups to Jiffy Lube franchisees; and

(h) discouraging suppliers from dealing directly with Jiffy Lube franchisees and from selling to them at competitive prices.

(# 19, Exh. B, para. 67)

So long as the alleged breaches continued, the Association sought a declaration that member-franchisees of the Association were relieved of any obligations to pay royalty fees to JLI or make contributions to the NAF pursuant to the License Agreement.

It is important to note in the first three counts of the Association's complaint, the Association sued on its own behalf on the basis of its own asserted contractual rights. In Count IV, the count seeking a declaratory judgment, the Association sued on behalf of its member franchisees. No relief was sought in the suit on behalf of the franchisees other than a declaratory judgment.

On or about July 29, 1991, authorized representatives of the parties executed a "Settlement Agreement Among Jiffy Lube International, Inc., Pennzoil Products Company, And Jiffy Lube Association Of Franchisees, Inc." (# 29, Appendix, Affidavit of William A. Howie, Exh. D) The following day, July 30, 1991, the district judge to whom the Association's case was assigned endorsed the parties' stipulation of dismissal with prejudice. (# 19, Appendix, Exh. 15)

### B. The Instant Litigation

Approximately seven months later, in February of 1992, Lube 495 instituted the instant case against JLI and PPC. The factual allegations upon which Lube 495's claims are premised are as follows.

A franchisee of JLI since November, 1984, Lube 495 originally owned and operated quick lube centers in Massachusetts east of Interstate 495. (Complaint # 1, para. 7) After acquiring Jiffy Lube development rights in adjacent geographic areas from Karot, Inc. (the "Karot Territory") in August of 1986, Lube 495 has exclusive rights to build and operate Jiffy Lube centers in all of southeastern Massachusetts, including Cape Cod, and Rhode Island. (*Id.*)

The franchise arrangement between Lube 495 and JLI is alleged to be governed by a License Agreement and an Area Development Agreement. (# 1, para. 8) Pursuant to the License Agreement which has a term of twenty years, Lube 495 is required to pay JLI a royalty fee based on gross monthly sales. (# 1, para. 12) On its part, JLI is obligated to provide Lube 495 with:

A. Exclusive rights to own and operate specific Jiffy Lube centers in the region east of Interstate 495 in Massachusetts and in the Karot Territory. Pursuant to additional agreements, Lube 495 has the exclusive rights to this entire territory;

B. Site location assistance;

C. Standardized procedures of operation as detailed in the Policies and Procedures Manual described in Section 11 of the License Agreement;

D. Continued efforts to negotiate purchasing arrangements with suppliers for products and supplies, as described in Part C of Section 13 of the License Agreement;

E. Assistance in planning effective local advertising, a continuing advertising campaign and coordination of regional program;

F. Assistance in locating suppliers whose products meet the required specifications;

G. Training programs and assistance as described in Section 8 of the License Agreement;

H. Standardized accounting procedures as described in Section 10 of the License Agreement;

I. Occasional reports of improvements in business and merchandising methods and other areas of the System as may be developed or acquired by JLI;

J. Field supervision and consultation to assist Lube 495 in those areas of the conduct of its Jiffy Lube business in which JLI determines that Lube 495 needs such assistance. Field supervision may include consultation and assistance with regard to hiring and training new employees, operational problems, and new methods of merchandising as they may be developed, and programs involving solicitation of fleet-type business to aid in building Lube 495's Jiffy Lube business. JLI shall schedule field supervision visits;

K. At JLI's cost, one (1) copy of: the Policies and Procedures Manual and such lubrication manuals, product manuals and catalogs, product cross-reference manuals, and related types of materials and charts which, in JLI's judgment, may be beneficial to Lube 495 in its daily business activity;

L. Review and analysis of financial and operating statements and notification of problem areas affecting profitability of the business;

M. Seminars and conventions to allow JLI and Lube 495 to exchange information and new ideas. If any annual seminars or conventions are held, Lube 495 has warranted and represented that it will send a representative to the same; and

N. Inspections of Lube 495 operations at least once per year.

(# 1, para. 13)

Further, pursuant to the terms of the License Agreement, Lube 495 was entitled to purchase its equipment, products and supplies from whatever source it chooses. (# 1, para. 15) JLI agreed to endeavor to negotiate volume purchasing arrangements for products and supplies and offer them to franchisees with a reasonable mark-up. (*Id.*) Finally, Lube 495 was required to contribute monthly to JLI's National Advertising Fund ("NAF") and to a regional advertising cooperation association (the "Cooperative"); JLI retained complete control over all advertising programs. (# 1, para. 16)

Turning to the Area Development Agreement, it is alleged that in August of 1986, JLI approved an assignment of Karot, Inc.'s rights under its area development agreement with JLI to Lube 495. (# 1,

para. 17) *Inter alia,* the Area Development Agreement states:

> Except as otherwise provided, the term of this Agreement shall be for four (4) continuous and successive terms or years from the date of its execution. *Area Licensee may renew for each succeeding year or term* provided Area Licensee has satisfactorily completed the terms of each year's or term's timetable of development and is not in default of any provision of this agreement ... or any other agreement between Area Licensee and Licensor, and has substantially complied with all the terms and conditions of such agreements during the terms thereof. Area Development Agreement ("ADA"), § II (emphasis added)

(# 1, para. 18)

Further provision was made that:

> Except as otherwise expressly provided herein, whenever approval or consent of Licensor is required, such approval will not be unreasonably withheld or delayed.

(# 1, para. 19)

In other significant part, the Area Development Agreement reiterated JLI's obligation not to establish competing quick lube centers within the franchisee's designated territory, to provide a training program, and to consult with the franchisee to assist in site selection and service center construction. (# 1, para. 20, 21, 22)

Lube 495 alleges that PPC acquired an 80% interest in JLI in January, 1990 and, by virtue of this acquisition, that PPC controls JLI. (# 1, para. 23) Prior to the acquisition, it is alleged that on March 14, 1988, PPC and JLI entered into a "Strategic Alliance Agreement." This is the same Strategic Alliance Agreement referenced in the Association's complaint. Although Lube 495 quotes portions of the agreement at length (# 1, para. 26, 27, 29, 30, 31), no purpose is served by reiterating the relevant terms previously detailed. The same is true with respect to the allegations concerning the March 17, 1989 Agreement between JLI and the Association (# 1, para. 32, 33, 34, 35) as well as the amendments to the Strategic Alliance Agreement between JLI and PPC. (# 1, para. 37)

Count I of Lube 495's complaint is a claim for breach of contract against JLI. It is alleged that JLI's incompetent selection and assistance in selection of sites and its pressuring of Lube 495 to develop the substandard sites in the Karot Territory constitute breaches of the Area Development Agreement. (# 1, para. 38–45) Count II is a second breach of contract claim against JLI. Essentially, Lube 495 contends that JLI's refusal to renew the term of the Area Development Agreement despite Lube 495's contractual right to renew is in bad faith and constitutes a breach of that Agreement. (# 1, para. 46–51) In Count III against JLI, it is alleged that JLI made representations to Lube 495 that it would renew the Area Development Agreement and that Lube 495 relied on that promise to its detriment.

Both JLI and PPC are named in Count IV. First, Lube 495 alleges that the License Agreement and the Area Development Agreement each specify that JLI shall not establish or operate competing quick lube centers. (# 1, para. 58) Then Lube 495 alleges that PPC has permitted at least one independently owned quick lube center to operate within two miles of a Lube 495 center in violation of the License Agreement. (# 1, para. 59) Lube 495 concludes that the defendants have breached the License and Area Development Agreements by overseeing, operating and assisting competing independent centers. (# 1, para. 62) Further in Count IV, Lube 495 alleges additional breaches of the License and Area Development Agreements by the defendants, i.e., broadcasting advertisements directly undermining what Lube 495 had paid for under the License Agreement (# 1, para. 63–66); advertising to the "do-it-yourself" market which represents the largest competition for Lube 495 (# 1, para. 63–66); and undermining Lube 495's active support of certain legislation in order to favor "do-it-yourselfers." (# 1, para. 67)

In Count V Lube 495 contends that the acts detailed in Count IV, in addition to constituting breaches of the express terms of the License and Area Development Agreements, simultaneously constitute

breaches of the covenant of good faith and fair dealing implied in those contracts by JLI and PPC. (# 1, para. 70–73) These same acts are alleged to be breaches of fiduciary duties that JLI and PPC owed to Lube 495 as a franchisee in Count VI. (# 1, para. 74–78)

In Count VII, Lube 495 alleges that the following acts by JLI and PPC breach the License Agreement:

(a) Refusing to negotiate supply contracts at the best price possible for the benefit of Lube 495;

(b) Permitting Heritage, a wholly owned merchandising subsidiary of JLI, to become a profit center, over and above the royalties paid by Lube 495, at the expense of Lube 495;

(c) Using Heritage to allow JLI to gain a profit, over and above the royalties paid by Lube 495, through Heritage's promotion of Pennzoil products at inflated prices;

(d) Attempting to chill Lube 495 from directly negotiating with alternative suppliers;

(e) Chilling oil suppliers from negotiating directly with Lube 495 for bulk purchase discounts;

(f) Entering into contracts with suppliers which precluded the suppliers from selling directly to Lube 495 and required them to sell only through Heritage with unreasonable markups to Heritage;

(g) Prohibiting Lube 495 from buying oil and air filters directly from Purolator but insisting that Lube 495 only buys these filters from Heritage (at a markup) even though Heritage adds no valve and does not even touch the filters; and

(h) Impairing Lube 495's contractual right to market itself as a distribution system and to receive the benefit of volume purchasing and financing deals by naming Pennzoil as the "oil of choice" in the Strategic Alliance Agreement, by requiring the installation of Pennzoil signs on Lube 495 centers, and by employing an advertising campaign that seeks to fuse the Jiffy Lube name with that of Pennzoil.

(# 1, para. 79–93)

Again, the same acts are alleged to constitute breaches of the implied covenant of good faith and fair dealing by JLI and PPC in Count VIII (# 1, para. 94–96) and breaches of fiduciary duties in Count IX. (# 1, para. 97–100)

Naming both JLI and PPC in Count X, Lube 495 therein alleges that by failing to fulfill the obligation to provide advertising, the defendants have breached the License Agreement. (# 1, para. 101–105) In Count XI, Lube 495 alleges JLI and PPC have committed a litany of breaches of the franchise agreements as follows:

(a) Defendants have failed to provide standardized procedures of operation;

(b) Defendants have failed to provide adequate training programs;

(c) Defendants have failed to provide standardized accounting procedures;

(d) Defendants have failed to provide Lube 495 with reports of improvements in business and merchandising methods;

(e) Defendants have failed to provide Lube 495 with field supervision and consultation;

(f) Defendants have failed to publish and update a Policies and Procedures Manual;

(g) Defendants have failed to provide Lube 495 with reasonable site location assistance;

(h) Defendants have failed to assist Lube 495 in planning effective local advertising;

(i) Defendants have failed to assist Lube 495 in locating suppliers whose products meet required specifications;

(j) Defendants have failed to assist Lube 495 in planning a continuing advertising campaign and in coordinating regional programs;

(k) Defendants have failed to provide Lube 495 with analyses of Lube 495's financial and operating statements;

(l) Defendants have failed to conduct seminars and conventions to facilitate the exchange of information and new ideas;

(m) Defendants have failed to develop any marketing program or strategy;

(n) Defendants have failed to provide Lube 495 with the required construction support;

(o) Defendants have failed to assist Lube 495 with site development;

(p) Defendants have failed to make the required number of inspections of Lube 495's centers; and

(q) Defendants have failed to replace the District Sales Manager, who departed JLI in September, 1991, to assist with operations.

(# 1, para. 106–108)

JLI alone is named in Count XII. Lube 495 claims that by charging Lube 495 a 6% royalty fee as opposed to a 5% royalty fee the parties agreed to in an Option Agreement dated June 30, 1983, JLI has breached the option agreement. (# 1, para. 109–115) In Count XIII it is alleged that JLI, by forcing Lube 495 to pay an arrearage and interest on disputed payments to the NAF, has breached the License Agreement. (# 1, para. 116–120) In Count XIV, Lube 495 alleges that JLI made false representations with respect to its financial strength, and failed to disclose the existence of side deals with other franchisees. (# 1, para. 121–128) Lube 495 claims to have relied upon these misrepresentations and has consequently been injured. (*Id.*)

Count XV is a claim against JLI and PPC for tortious interference with prospective advantageous relations. Lube 495 alleges that the defendants wrongfully interfered with its relationships with various suppliers, resulting in substantial damage to Lube 495. (# 1, para. 129–131) The next claim, Count XVI, is against PPC for tortious interference with contractual relations. The plaintiff alleges that when PPC acquired 80% of the stock of JLI, PPC was aware of the contractual provisions of the franchise agreement between Lube 495 and JLI that prohibited JLI from establishing competing quick lube centers. (# 1, para. 132–134) By supporting independent quick lube centers in Lube 495's exclusive territory and continuing to target the "do-it-yourselfers" market, the plaintiff contends the PPC has induced JLI to breach its contractual obligations to Lube 495. (# 1, para. 135–136)

In Count XVII, JLI is alleged to have breached its fiduciary duty owing to Lube 495 in that JLI has purportedly mismanaged the NAF, failed to expend the funds in NAF for the benefit of the franchisees including the plaintiff, and, in fact, has expended NAF monies to support Lube 495's competitors. (# 1, para. 137–145) JLI and PPC are alleged to have breached the covenant of good faith and fair dealing in Count XVIII by:

(a) Refusing to renew the term of the Area Development Agreement unless Lube 495 agrees to execute a release of all of its claims against it;

(b) Continuing to charge and receive royalty fees from Lube 495 under the License Agreement despite compromising Lube 495's exclusivity rights within the Karot Territory by its refusal to renew the term of the Area Development;

(c) Breaching virtually every support obligation to Lube 495 contained in the Licensing Agreement;

(d) Misrepresenting material facts to Lube 495;

(e) Failing to produce the FTC Disclosure Statement to Lube 495; and

(f) Making factually incorrect and misleading statements in the FTC Disclosure Statement.

(# 1, para. 146–148)

In the final count of the complaint, Count XIX, Lube 495 alleges that JLI and PPC have violated Massachusetts General Laws, chapter 93A. The purported unfair and deceptive trade practices in which the defendants have engaged are:

(a) Refusing to renew the term of the Area Development Agreement unless Lube 495 agrees to execute a release of all of its claims against it; and

(b) Continuing to charge and receive royalty fees from Lube 495 under the License Agreement despite compromising Lube 495's exclusivity rights within the Karot Territory by its refusal to renew the term of the Area Development;

(c) Permitting at least one independent competitor of Lube 495 to operate with the name "Pennzoil Ten Minit Oil Change Center;"

(d) Amending the April, 1989 Amendments to the Strategic Alliance Agreement to eliminate Pennzoil's commitment to discontinue its Ten Minit Oil Change program;

(e) Impermissibly making the knowledge and systems developed over the years by JLI and its franchisees available to independent competitors of Lube 495;

(f) Undermining the "brand fusion" ads paid for by Lube 495 by running simultaneous ads promoting sales of oil to "do-it-yourselfers;"

(g) Permitting at least one independent competitor of Lube 495 located within Lube 495's territory to feature prominently the Pennzoil name and logo in local advertising; and

(h) Hiring a lobbyist to defeat a waste oil recycling bill activity supported by Lube 495 that would have encouraged "do-it-yourselfers" to utilize oil change service centers like Lube 495;

(i) Refusing to negotiate supply contracts, including those for oil and filters, at the best price possible for the benefit of Lube 495;

(j) Permitting Heritage to become a profit center, over and above the royalties paid by Lube 495, at the expense of Lube 495;

(k) Using Heritage to allow Pennzoil to gain a profit, over and above the royalties paid by Lube 495, through Heritage's promotion of Pennzoil products at inflated prices;

(l) Attempting to chill Lube 495 from directly negotiating with suppliers;

(m) Chilling oil filter suppliers from negotiating directly with Lube 495 for bulk purchase discounts;

(n) Entering into contracts with suppliers which precluded the suppliers from selling directly to Lube 495 and required markups to Heritage;

(o) Impairing Lube 495's contractual right to market itself as a distribution system and to receive the benefit of volume purchasing and financing deals by naming Pennzoil as the "oil of choice" in the Strategic Alliance Agreement, by requiring the installation of Pennzoil signs of Lube 495 centers, and by employing an advertising campaign that seeks to fuse the Jiffy Lube name with that of Pennzoil;

(p) Breaching virtually every support obligation to Lube 495 contained in the Licensing Agreement;

(q) Misrepresenting material facts to Lube 495;

(r) Failing to produce the FTC Disclosure Statement to Lube 495; and

(s) Making factually incorrect and misleading statements in the FTC Disclosure Statement.

(# 1, para. 149–151)

Lube 495 alleges that each of these enumerated acts either standing alone or together is an unfair and deceptive act or practice proscribed by §§ 2 and 11 of M.G.L. ch. 93A.

## IV.  THE LAW

### A.  The Positions of the Parties
### Re:  Res Judicata

The defendants' motion for partial summary judgment is based on their contention that the disposition of Count IV of the Association's suit operates as res judicata and bars the plaintiff from pursuing Counts I, IV through XI, XIII and XV through XIX of the complaint in the instant case.  Plaintiff avers that the disposition of Count IV of the Association's suit does not have any res judicata effect on the instant case.  The resolution of the dispute turns on whether and in what circumstances the disposition of a suit for a declaratory judgment operates as res judicata to subsequent claims.

As noted hereinabove, the parties in the Association's suit filed a stipulation of dismissal with prejudice which, when approved by the court, terminated the litigation.  As regards that stipulation, in their settlement agreement, the parties to the Association's complaint provided:

... The Parties intend that the dismissal with prejudice of the [Association's] suit be res judicata as to the claims of Counts I–III in any subsequent action by any person or entity; **as to Count IV, however, the Parties intend that it have only such effect as is provided by law, and the Parties express no intent to help or hinder any person or entity in any such subsequent action.**

Appendix # 19, Exh. 14 at p. 2 (emphasis supplied).

### B.  Res Judicata—In General

The doctrine of res judicata is rooted in the concept that " '[p]ublic policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties.' " *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 401, 101 S.Ct. 2424, 2429, 69 L.Ed.2d 103 (1981) *quoting Baldwin v. Travelling Men's Assn.*, 283 U.S. 522, 525, 51 S.Ct. 517, 518, 75 L.Ed. 1244 (1931). With jurisdiction based upon diversity, the rule in this Circuit is that the "federal law of res judicata governs the effect of a prior federal judgment." *Johnson v. SCA Disposal Services of New England*, 931 F.2d 970, 974 (1 Cir., 1991). Explaining the federal law standard of res judicata, the First Circuit has written:

Once there has been an adjudication on the merits, federal law stipulates that all claims which are "part of the same cause of action" are extinguished, whether or not actually asserted in the original action.

*Kale v. Combined Insurance Company of America*, 924 F.2d 1161, 1164 (1 Cir., 1991) (citations omitted).

According to the defendants, application of this standard mandates the dismissal of the majority of Lube 495's claims.

### C.  Res Judicata Effect of a Declaratory Judgment Action

The application of the principles of res judicata in the context of the instant suit is not quite as simple as the defendants would appear to advocate. To the contrary, some thorny issues arise. For example, a necessary predicate to the operation of the federal standard of res judicata as explicated by the First Circuit in *Kale* is "an adjudication on the merits." While a dismissal with prejudice "in a conventional suit for common law or equitable relief" normally has the effect of an adjudication on the merits for res judicata purposes, when an action is brought under the Declaratory Judgment Act as was Count IV of the underlying complaint, "familiar principles of res judicata cannot be applied automatically to judgments dismissing suits for declaratory relief without stated reasons." *Kaspar Wire Works, Inc. v. Leco Engineering And Machine Inc.*, 575 F.2d 530, 534–535 (5 Cir., 1978); *See also, Empire Fire And Marine Insurance Company v. J. Transport, Inc.*, 880 F.2d 1291, 1296 (11 Cir., 1989).

In the *Kaspar* case, the former Fifth Circuit engaged in a lengthy analysis of the knotty problems inherent in applying the dual doctrines encompassed within res judicata, claim preclusion and issue preclusion, in the declaratory judgment context.

### 1.  *Claim Preclusion*

The Fifth Circuit noted at the outset of its discussion in *Kaspar* that:

... the rules of claim preclusion are difficult, if not impossible, to apply in the usual form when a declaratory judgment proceeding ends in a judgment that states no more than "dismissed with prejudice." Further, as the Declaratory Judgments Act indicates, claim preclusion may be inappropriate given the purposeful supplementary nature of declaratory relief.

*Kaspar Wire Works, Inc. v. Leco Engineering And Machine, Inc., supra*, 575 F.2d at 536.

Examining the provisions of the Declaratory Judgments Act, particularly 28 U.S.C. § 2202 which states that "[f]urther necessary and proper relief based on a declaratory judgment or decree may be granted ...," the court determined that:

This language necessarily implies that a declaratory judgment does not embrace

that aspect of res judicata known as merger: the prevailing party may seek further relief in the form of damages or an injunction.

*Id.* at 537 (citations omitted).

While acknowledging that the language of § 2202 was not an impediment to the application of res judicata as a bar, the court nonetheless concluded that:

... unless the declaratory suit necessarily presents all questions of duty and breach that would have arisen in a claim brought by the defendant against the plaintiff in a conventional suit, a determination whether the judgment should have preclusive effect is not necessarily advanced by trying to characterize some set of issues in the declaratory suit as a "claim" or "cause of action" and then applying claim preclusion rules reflexively to that "claim."

*Kaspar Wire Works, Inc. v. Leco Engineering And Machine, Inc., supra,* 575 F.2d at 537 (citation omitted).

In my view, the *Kaspar* court's analysis with respect to claim preclusion is persuasive, both in a logical and in a practical sense.

In addition to the *Kaspar* and *Empire Fire* courts, several circuit courts have acknowledged an exception to the broad preclusive effect of the doctrine of res judicata when the prior litigation sought solely declaratory relief. For example, the Second Circuit, responding to an argument that a claim was barred because it could have been raised as a counterclaim to a previously filed and adjudicated declaratory judgment action, rejected the argument on the basis of the exception writing:

[U]nder this exception, the preclusive effect of the declaratory judgment is limited to the subject matter of the declaratory relief sought. The plaintiff or defendant may continue to pursue further declaratory or coercive relief. *See,* Restatement (Second) Of Judgments, § 33, Comment C (1982); *Horn & Hardart Co. v. National Rail Passenger Corporation,* 843 F.2d 546 (D.C., Cir.), *cert. denied,* 488 U.S. 849, 109 S.Ct. 129, 102 L.Ed.2d 102 (1988); *Smith v. City of*

*Chicago,* 820 F.2d 916 919 (7th Cir., 1987); *Minneapolis Auto Parts Co. v. City of Minneapolis,* 739 F.2d 408, 410 (8th Cir., 1984).

*Harborside Refrigerated Services, Inc. v. Vogel,* 959 F.2d 368, 372 (2 Cir., 1992).

Thus, the doctrine of claim preclusion cannot be invoked to bar claims which could have been raised in a prior declaratory judgment action but were not.

The defendants argue that the exception does not apply if the declaratory action "necessarily presents all questions of duty and breach that would have arisen in a claim brought by the defendant against the plaintiff in a conventional suit ..." *Id.* As the lengthy discussion of the facts and allegations of the two complaints set forth heretofore reflects, not all questions of duty and breach were raised in the Association's suit. Accordingly, the doctrine of "claim preclusion" cannot be invoked to bar any of the plaintiff's claims in the instant litigation on the basis of res judicata.

### 2. *Issue Preclusion*

Turning to the question of issue preclusion, the *Kaspar* court held that, because the earlier judgment was entered on a consent decree dismissing the suit, "no issue of law or fact was ever adjudicated," and, consequently, that judgment had no issue preclusive effect. *Kaspar Wire Works, Inc. v. Leco Engineering And Machine, Inc., supra,* 575 F.2d at 537. The Eleventh Circuit has noted that this holding is supported by the Restatement of Judgments 2d Section 33 (1982), which provides:

A valid and final judgment in an action brought to declare rights or other legal relations of the parties is conclusive in a subsequent action between them as to matters declared, and, in accordance with the rules of issue preclusion, as to any issues actually litigated by them and determined in the action.

*Empire Fire And Marine Insurance Company v. J. Transport, Inc., supra,* 880 F.2d at 1296 n. 6 (citations omitted)

At the same time, the *Kaspar* court emphasized that the effect to be given a consent

decree is governed by the intent of the parties.

> Whatever type of repose is sought to be invoked as a result of a judicial consent decree, a court should take into account the fact that it was rendered by consent and determine its impact by the issues actually intended to be precluded by the parties.

> . . . .

> If they have in their compromise indicated clearly the intention that the decree to be entered shall not only terminate the litigation of claims but, also, determine finally certain issues, then their intention should be effectuated.

*Kaspar Wire Works, Inc. v. Leco Engineering And Machine, Inc., supra,* 575 F.2d at 539 (footnote omitted).

In the present case, with respect to Count IV, the parties expressed the intent that the dismissal with prejudice "have only such effect as is provided by law."

### 3. *Defendants' Additional Arguments Re: Res Judicata*

The defendants articulate several reasons why, in their view, a declaratory judgment exception to res judicata is not applicable in the present case.

First and foremost, it is argued that the First Circuit has never adopted or applied this declaratory judgment exception. From all that appears, this is true; the parties have not cited any such case nor has the Court, in the course of its research, found one. By the same token, it cannot be said that the First Circuit has rejected the concept of such an exception. Rather, the bottom line is that the First Circuit has yet to have occasion to squarely address the issue.

The cases upon which the defendants rely can all be distinguished on their facts. In *General Foods Corporation v. Massachusetts Department of Health,* 648 F.2d 784 (1 Cir., 1981), the First Circuit determined that res judicata barred a member of a trade association from again challenging a Massachusetts food labeling regulation in federal court following a state law suit brought by the association for a declaratory judgment. There is no indication that the question of a declaratory judgment exception was ever raised by General Foods. Moreover, the underlying state case was decided on the merits, and the challenge to the constitutionality of the regulation was identical in both suits. Applying the *Kaspar* rationale, in these circumstances, issue preclusion would attach in any event due to the prior court adjudication. Similarly, in *Bergeron v. Estate of Loeb,* 777 F.2d 792 (1 Cir., 1985), the First Circuit barred only the claim previously raised and actually determined by the Nevada state court in a declaratory judgment action. Other claims, the merits of which were not before the Nevada court, were not precluded by res judicata. *Id.* at 794–797.

In the remaining cases cited by the defendants, the plaintiffs in the first litigation sought not only declaratory relief, but also specific coercive relief. In one case, the plaintiff had filed a complaint for declaratory and injunctive relief in the state court. *Pasterczyk v. Fair,* 819 F.2d 12, 13 (1 Cir., 1987). In both *Johnson v. SCA Disposal Services Of New England, Inc.,* 931 F.2d 970 (1 Cir., 1991) and *Rose v. Town of Harwich,* 778 F.2d 77 (1 Cir., 1985), the plaintiffs had sought declaratory relief and damages. It does not appear that a declaratory judgment exception was advanced in any of these cases. Moreover, in each of these three suits, the final adjudication of the claims was actually determined by a judge or jury.

To summarize, the facts in the case at hand are different in significant detail from those in which the First Circuit to date has applied the doctrine of res judicata to bar a second action when the initial action sought a declaratory judgment. Moreover, in the five cases cited by the defendants the applicability of a declaratory judgment exception was neither raised nor decided.

The defendants next argue that to the extent that a declaratory judgment exception to res judicata is recognized, it is inapplicable here because the plaintiff in Count IV of the underlying complaint did not seek

solely declaratory relief.[3] It is true that in Count IV, the Association requested "that the Court grant such further relief as it may deem just and proper, including costs and such fees as may be allowable." This language is clearly boilerplate.

At most, the Association appears to have been invoking the provision of Title 28 U.S.C. § 2202 which states "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." Because no declaration of rights was made, by the terms of the statute, the Association was not entitled to seek further relief. In any event, unlike other cases where a second suit has been barred, the Association did not seek specific coercive relief such as an injunction or damages in addition to a declaratory judgment. I do not find the very broad and general language employed by the Association to be sufficient to constitute "coercive relief" such as to take the case outside the declaratory judgment exception.

Moreover, again, there was no adjudication on the merits of the claim by the court so as to warrant a bar based upon claim preclusion. I see nothing in the circumstances of the present case that would prohibit the application of the declaratory judgment exception.

#### 4. *Conclusion*

To summarize, I find the *Kaspar* case to be most analogous to the factual scenario with which the Court is presently faced. Like the Eleventh Circuit, I find the *Kaspar* court's analysis to be persuasive. Given the procedural history and the facts involved, I must conclude that Count IV of the Association's complaint seeking declaratory relief does not bar Lube 495's present action under the doctrine of res judicata. The defendants' motion for partial

summary judgment on that ground will be denied.

#### D. Defendants' Additional Grounds for Partial Summary Judgment

The defendants advance two additional grounds for seeking partial summary judgment: 1) that Lube 495 has failed to state a claim against PPC for breach of JLI's agreements, or against JLI for the alleged conduct of PPC; and 2) that Counts VI and IX should be dismissed because neither JLI nor PPC owes any fiduciary obligation to Lube 495. Given the manner in which Lube 495 has pleaded its complaint as discussed earlier in this memorandum[4], any attempt to analyze the merits of these arguments at this juncture would be an exercise in futility.

The defendants aptly note:

In order for the defendants and this Court to understand and assess each claim, it is critically important to consider (a) which agreement or relationship is at issue, (b) what alleged conduct purportedly violated an asserted right of Lube 495, and (c) which defendant engaged in that conduct.

Memorandum of Defendants, # 18 at p. 27. At present, the identity of the relevant parties as well as the relationships by and between them is quite confused.

Accordingly, I shall deny the motion for partial summary judgment on these grounds without prejudice and direct that Lube 495 file and serve, *on or before the close of business on Friday, February 26, 1993*, an amended complaint, consonant with the provisions of Rule 11, Fed.R.Civ. P., wherein the parties involved in this litigation, and their relation to one another, are clarified.

### V. ORDER

It is ORDERED that the Motion of Defendants Jiffy Lube International, Inc. and Pennzoil Products Company for Partial

---

**3.** It is to be recalled that Count IV of the Association's complaint is the only count in which the Association sued on behalf of its member franchisees; no argument is made that because Counts I, II and III of the Association's complaint, the counts in which the Association sued to enforce its own asserted rights, sought coercive relief, those counts operate as res judicata to the plaintiff's claims in the instant litigation.

**4.** *See* pp. 101–02, *supra.*

Summary Judgment (# 17) be, and the same hereby is, DENIED to the extent that the defendants seek summary judgment on Counts I, IV through XI, XIII and XV through XIX of the complaint on grounds of res judicata. It is FURTHER ORDERED that the Motion of Defendants Jiffy Lube International, Inc. and Pennzoil Products Company for Partial Summary Judgment (# 17) be, and the same hereby is, otherwise DENIED without prejudice to filing a motion for partial summary judgment after the plaintiff files and serves an amended complaint in which the plaintiff's allegations respecting the parties involved in this litigation, and their relation to one another, are clarified.